Argued April 14, affirmed May 25, 1955

## IN THE MATTER OF THE ESTATE OF FELIX COMEGYS, DECEASED

## DONEEN v. CRAVEN, EXECUTOR ET AL

284 P. 2d 758

*Donald L. Burcham,* Spokane, Washington, argued the cause for appellant.

*Asa L. Lewelling,* Salem, argued the cause and filed a brief for respondents James R. Mischel and Margery Anne Mischel.

Before WARNER, Chief Justice, and TOOZE, LUSK and BRAND, Justices.

LUSK, J.

This is a will contest based on alleged incompetency of the testator, undue influence, and an oral agreement on the part of the testator to die intestate so that the contestant, his sister and next of kin, would inherit from him. The last mentioned ground has been aban-

doned. The court entered a decree sustaining the validity of the will, and the contestant has appealed.

■ The testator, Felix Comegys, a lifelong resident of Polk County, died on October 20, 1952, at the age of 82 years, leaving a last will and testament executed on January 14, 1952, by which he devised certain described real and personal property to Robert Gould and Clara Gould, his wife, and the entire residue of his estate to James R. Mischel and Margery Anne Mischel, his wife, and nominated Walter J. Craven, of Dallas, Oregon, as his executor. Margery Anne Mischel (referred to in the record as Anne) was a third or fourth cousin of the decedent. He left surviving him as his next of kin a sister, Ida C. Doneen, the contestant. The acts of undue influence relied on to invalidate the will are charged only against James R. Mischel (referred to in the record as Jim) and his wife, Anne. Their ages at the time of the testator's death were, respectively, 27 and 25 years. The estate was appraised at more than $80,000, the land devised to Robert and Clara Gould being of the value of $12,000. Much the largest part of the estate consisted of farm land in Polk County. Part of this land the testator inherited; part he acquired by purchase. His sister, Ida, owns an undivided interest in the inherited lands from which she receives an income of approximately $1500 a year.

Felix never married. Ida married Edmund Joseph Doneen, and was living with him on a farm in Whitman County, Washington, at the time of his death in 1935. Ida then went to live with Felix in the farm home near Amity, Oregon. In February, 1951, Ida, then 83 years of age, fell and broke her hip and was confined to the hospital until July of that year when she was returned to Felix's home. At the suggestion of Ida, who was bedfast, Anne was employed to care for Ida and to do the housework. Anne, who was brought up

on a farm some five or six miles distant from the Comegys place, was married at the time and living with her husband in Seattle, where he was studying photography. It was while she was on a visit to her parents' home that she was asked to take over the household duties and the care of Ida at the Comegys home. Her husband meanwhile went to New York to continue his photographic studies.

In August, 1951, Ida, being still bedfast, was removed by ambulance to the home of her son and daughter-in-law, Mr. and Mrs. Harold C. Doneen in Whitman County, Washington. There she has remained ever since and she is still an invalid.

At Felix's request Anne continued to live in his home, and, when Jim was about to rejoin his wife in Oregon in November, 1951, Felix suggested that they should both stay with him until they decided upon where they were going to live. This was agreed to and the three of them lived in the Comegys house until Felix's death. This was not Jim's first acquaintance with Felix. He had met him in 1947 before his marriage to Anne, upon her return from a month's automobile trip with Felix and Ida. After their marriage Jim visited the Comegys home several times with Anne before he went East, and in 1950 he and Anne and Felix and Ida went on a ten-day automobile trip together. Felix did not drive an automobile, and apparently one of his reasons for wishing to have the young people live with him was that they both could drive. They frequently acted as his chauffeurs, and in December, 1951, drove him to California where he visited friends.

Jim obtained temporary employment during December of 1951 with a photographic studio in McMinnville. This employment terminated about Christmastime. He discussed with Felix opportunities to get a

job in Roseburg or to buy a studio in Salem, and, during the conversation, Felix, according to Jim's testimony, "mentioned the fact to me that he needed somebody to stay and help him and take care of him, and so forth, and if we would stay there and do that for him he would help us." Jim understood this to mean that Felix would lend them the money for the purchase of the studio.

On the morning of January 1 or 2, 1952, Anne told Jim that Felix wished to go to town to make his will, and, accordingly, on January 2 Jim drove Felix to Dallas where they went to the law office of Hayter & Shetterly. Mr. Philip Hayter, of that firm, is the son of the late Oscar Hayter, who practiced law in Polk County for many years and was a distinguished member of the Bar of this state. Oscar Hayter had performed legal services for Felix. En route Felix told Jim what he wanted in his will. At the law office they found Mr. Shetterly, and, at the request of either Felix or Shetterly, Jim was invited into the latter's private office and was present during the discussion between Shetterly and Felix respecting the terms of the proposed will. He, however, took no part in the discussion. He had remained in the outer office until after the other two had entered Shetterly's private office when one of them asked him to come in. They were there for half or three quarters of an hour while Mr. Shetterly obtained the necessary information for the preparation of the will. Mr. Shetterly advised Felix that he would let him know when the will was ready to be signed. Felix and Jim returned home and no further allusion to the will was thereafter made by either of them to the other. Several days later a letter came for Felix notifying him that the will was ready for his signature, and on January 14 Jim again drove Felix to Dallas, Anne accompanying them this

time for the reason that she and Jim had shopping to do. Jim went with Felix as far as the office of Hayter & Shetterly and left him there while he and Anne did their shopping. In some 20 or 30 minutes they returned, and, the will having been executed, they drove back home. From that time until his death Felix did not mention his will. He admonished Jim to say nothing about it, and Jim spoke of it to no one except his wife. Jim did not see the will until after Felix's death.

The will was witnessed by Philip Hayter and Kenneth E. Shetterly, both of whom testified on the trial to its due execution and to the mental competency of the testator.

The evidence to support the charge of incompetency is so woefully deficient that the claim has been all but abandoned in this court. We can find no convincing evidence of any impairment of the testator's mental faculties in January, 1952, when he executed his will, while there is an abundance of evidence coming from unimpeached witnesses from which the only conclusion to be drawn is that the man's mind was good and that he knew what property he owned and knew exactly what he was about both before, at the time of, and after the execution of the will. It is necessary to refer only to a few parts of the record. A witness for the proponents was Mearl Hammond, of McMinnville, an accountant, who, beginning with January, 1948, prepared Felix's income tax returns. Felix called at Hammond's office sometime between January 1 and January 15, 1952. He brought with him a statement of his receipts and disbursements for the previous year, made out in his own hand, to be used as the basis for the federal return. The statement was produced by Hammond and is in evidence. The items are correctly totaled. Again, when Felix went to Mr. Shetterly's office to have his will drawn, he took with him his

real property tax receipts. While in the office he separated the receipts for taxes on the land he was devising to Robert and Clara Gould from the receipts covering the remaining land so that the attorney might thereby ascertain the description of the land to be devised to the Goulds and incorporated in the will. His sister, Ida, entrusted Felix with the responsibility of attending to her business affairs in connection with her interest in the Polk County land, which was farmed by tenants under a crop lease, and there is no complaint about the manner in which he discharged this duty. Orval Kurtz, a neighbor who lived on an adjoining farm and had known Felix and Ida for 30 years, was a witness for the contestant and testified to some forgetfulness and loss of interest in the operation of his farm on the part of Felix during the last two years of his life. But he admitted that in the spring of 1952 he was willing to make a loan to Felix of $6,000, and that he actually did lend him $2400 in May, 1952, and that he guessed "he knew what he was doing" and "felt he was all right". Felix banked with the Dallas City Bank, which was accustomed to lend him money when he asked for it without requiring any security. Lawrence J. Smith, vice president of the bank, testified that the last loan he made Felix was of $1,000 in July, 1952, and that in September of that year Felix came to the bank and had the insurance coverage on an automobile transferred to a new car which he had purchased. In short, the entire testimony shows that the testator was a man who, up to within a few weeks of his death, transacted all his own business, looked after the business affairs of his sister, and exhibited such a degree of competency in these matters that no one among his numerous friends and acquaintances and the people with whom he did business ever seems to have questioned in his lifetime his ability to take care of

himself. These are facts which speak much more eloquently than the opinions of witnesses called to testify at the trial respecting his mental competency, though, here too, the great weight of the evidence is on the side of the proponents of the will.

The real contention, however, seems to be that, while the testator may not have been laboring under such a serious disability as to have rendered him incompetent, he had reached a stage of senility in the last year of his life which weakened his will and clouded his understanding and destroyed his power to resist the alleged designs of the Mischels upon his estate. The contestant points to the testimony of Dr. I. D. Bartell, a Dallas physician, and of the nurses in a hospital conducted by him. Dr. Bartell had attended Ida in her illness, and, according to his testimony, he treated Felix in January, 1951, at his office for an ailment which he described as "rheumatism, senility". (We may say parenthetically that the record shows that Felix suffered from arthritis in his right arm which limited his use of the arm and affected his ability to write.) Dr. Bartell also attended Felix in his last illness. In answer to a question whether Felix had "enough intelligence to know in detail what property he had" in July, 1951, he expressed the opinion that "I don't think he was capable." In view of the uncontradicted evidence as to what Felix did know about his property and what he was doing in the management of his own affairs, not only in July, 1951, but in 1952 after the execution of the will, Dr. Bartell's opinion is entitled to no weight. As to the nurses, one of them testified only to her observation of Felix after he was admitted to the hospital a few days before his death, and the other to the fact that he would pay the doctor's charge after an office call by check, and would ask the nurse to write out the check for him, which she did.

In view of the arthritis in his right arm it could hardly be said that this testimony is relevant to his mental condition.

■ Upon the question of undue influence, it is contended that a confidential relationship existed between the testator and the Mischels, and, therefore, that the latter have the burden of disproving the charge. The circumstances which led to Anne and Jim Mischel making their home with Felix have already been related. It should be stated here that there is no credible evidence that Anne had anything to do with Ida leaving the home and going to eastern Washington to live with her son and daughter-in-law. That was Ida's own decision and, perhaps, Felix's as well. Both Felix and Anne accompanied Ida on that trip. Anne rode in the ambulance with the invalid and Felix was driven by Anne's mother. While at the Doneen place, according to the testimony of Mrs. Doneen, a witness for the contestant, Felix said to her: "You know, I haven't got much longer to live and I'm not going to be bothered dragging a lot of nurses along, I'm going to have fun for the last few years that I have to live."

The testimony reveals Felix Comegys as a friendly, gregarious man, who enjoyed life and lived it fully almost to the very end. In his younger years he had been a keen horseman, and he never outgrew his love of horses. One of his sources of enjoyment was attending rodeos and riding in the rodeo parades. According to one witness, he never missed a rodeo that was close enough for him to attend. In the record is a photograph of him riding a horse in the Phil Sheridan Day parade in Sheridan in June, 1952, only a few months before his death. He had a pool table at home and spent three or four evenings a week with his friends playing pool. He enjoyed playing cards. As already stated, he gave his personal attention to the business of the rentals

from the farm lands owned by him and his sister. He made numerous automobile trips. The distance from his home to the Doneen farm in eastern Washington is 400 miles. Between November, 1951, and September, 1952, he made four trips there to see his sister and other relatives in that part of the country. In addition he made the trip to California, already mentioned, in December, 1951. There is not a word in the record which even suggests that he did not see whom he pleased or go where he pleased, or that the Mischels or anyone else ever tried to prevent him from doing so. He was apparently carrying out the purpose he expressed to Mrs. Doneen ''to have fun for the last few years that I have to live'', and, as far as the record discloses, Anne and Jim Mischel were aiding him to the best of their ability in that laudable undertaking.

It would appear that Anne was more to him than a distant relative, housekeeper and chauffeur. She was a horsewoman, and, as a girl in her teens, frequently rode over to the Comegys' place to visit with Felix and Ida. It may be assumed that there was a bond of affection between them and, also, that Felix had a high regard for Anne's husband. He loaned Jim $2400 on his unsecured note with which to purchase a photographic studio in Sheridan. But there is no evidence that either Anne or Jim ever participated in any way in his business affairs or that he ever looked to them for advice, either about business or his comings and goings or anything else, or that he was in any sense dependent upon them except to the extent that they contributed to his comfort at home, drove a car for him, and afforded him companionship.

On this evidence we cannot say that there was such a relationship of trust and confidence between Felix Comegys on the one side and Anne and Jim Mischel on the other as to cast on them the duty of proving

that the will was not the product of their undue influence. In the recent case of *In Re Estate of Manillus Day,* 198 Or 518, 530, 257 P2d 609, we said:

"A confidential relationship * * * means a fiduciary relationship, either legal or technical, wherein there is a confidence reposed on one side with *a resulting superiority and influence on the other.* It may be a moral, social, domestic or merely a personal relationship." (Italics added.)

We agree with counsel for the contestant that the rule is not limited to fiduciaries in the commercial or business sense. But, before a person may have cast upon him the duty of proving innocence of wrongdoing, it must appear that that relationship is such as to indicate a position of dominance by the one in whom confidence is reposed over the other. There is no such state of affairs revealed by the evidence in this case. The superiority was all on the other side. The initiative was with Felix Comegys, and his beneficiaries are not to be penalized simply because he had affection for them and confidence in their integrity and good purposes.

The contestant argues that the exercise of undue influence is seldom susceptible of direct proof, and points to certain circumstances which it is urged establish such influence in this case. These, as stated in the brief, are (1) the activity of Mischel in taking Felix to have the will prepared; (2) the secrecy which Mischel testified the decedent requested concerning the will; (3) the testator's failure to obtain disinterested advice; (4) the total variance between the terms of the will and the testator's fixed, expressed intention over many years that his sister, Ida, should have his entire estate; (5) the complete monopolization by Jim and Anne Mischel in their capacity of cook, housekeeper, chauffeur and social companions of the testator's entire life.

To illustrate the alleged "complete monopolization" the brief says at another point:

> "Orval Kurtz and wife, who were long-time friends and tenants of decedent's farm, testify that after the Mischels' arrival they saw very little of Felix. The facts show a determined campaign to obtain domination over the man's entire life."

There was no "activity" of Jim Mischel, in the invidious sense, in connection with the preparation of the will. He simply complied with the request of his benefactor to drive him to his lawyer's office. Jim did not select the attorney and was a mere looker-on while the provisions of the will were being discussed. The testator did have disinterested advice—that of an attorney of his own selection, and he gave the attorney full information about his property, his relatives, and the disposition he wished to make of his estate, and named the man he wished for his executor. He told Mr. Shetterly that he wanted Walter J. Craven, a vice president of the Dallas City Bank, whom he had known and done business with since 1919, to act as his executor, and, while he was in the office, the attorney called Mr. Craven to find out whether he was willing to serve in that capacity. It would have been nothing else than an unwarranted impertinence on the part of Jim Mischel to have suggested to Felix that he should consult with someone other than his attorney before making his will. It is Jim's testimony that Felix asked him not to say anything about the will "because he knew there would be a fuss about it." The unfavorable inferences sought to be drawn from that testimony are based on the assumption that it is false. The circuit judge, who saw the witness and heard him testify, evidently believed him, and we see nothing inherently improbable in the testimony. We know that Felix did execute the will and that he kept that fact to himself,

although he had ample opportunity, had he wished to do so, to disclose it to his sister, his nephew and his nephew's wife, and his close friends. He did not tell the Goulds, who are also beneficiaries under the will. It is manifest that he did not want the fact known, and, that being so, it was entirely natural for him to caution Jim about disclosing it. There was no "complete monopolization" of Felix by the Mischels. The fact is that Orval Kurtz testified that after Anne and Jim were living at Felix's home they took him to rodeos and other places and "he did not go around with me much," but that "I went to call on him and talk to him two or three times a week." When Felix went to see his sister in eastern Washington in September, 1952, it was the Goulds, not the Mischels, who drove him there, and during the same month Robert Gould drove him to the State Fair.

It is true that on several occasions—the last time being in 1950—Felix had stated, when the subject of wills came up, that he did not intend to make a will since without one his property would go by the law of inheritance to his sister, Ida. But, the mere fact that, during the intervening period, and in a change of circumstances, he changed his mind is not sufficient to make out a case of undue influence. If it were, then the Goulds, who by the will were given property of substantial value, would also stand convicted. But they are not even accused of any improper conduct.

■ It is argued that "the Mischels stand mute, attempting no explanation of this unnatural will." We do not know what explanation it was possible for them to offer other than to testify to the facts as they knew them. The explanation must be found, if at all, in all the circumstances of the case as they appear in the record before us. If one examining the record should conclude that it was "an unnatural will", that would

be a fact relevant to the issue of undue influence. It would not determine the issue because, of course, the testator had the legal right to dispose of his property as he saw fit. As a matter of fact, there is an explanation in the record. Mr. Shetterly was asked, when on the witness stand, whether Felix had said anything to him as to why he made no provision for his sister. He answered, "Well, he explained that fact that his sister was older than he, and that she had undivided ownership with him in the real property out there and that she was—I don't remember that he used the exact words, but he gave me the impression at least,—to understand that she was well cared for." Ida at that time was 84 years of age, and for nearly a year had been an invalid confined to her bed. She had an income and was being cared for by her son and daughter-in-law. The Mischels had become a part of Felix's household, and it is evident that he had formed an attachment for them and had reached the conclusion in his own mind that it would be a good disposition of his estate to leave it to this young couple who had been a comfort to him in his old age and whose lives were before them. In that view one might say that, at least in the judgment of Felix Comegys, this was not an unnatural will. So, also, of the Goulds. Robert Gould had known Felix all his life, and had been intimate with him since 1941 when their mutual interest in horses appears to have drawn them together. In 1950 Gould was operating a farm which he did not own. The owner decided to return to the place and Gould was faced with the necessity of leaving it. He told Felix about his situation and that he was thinking of trying to get a job as hired man with the Doneens. But Felix told him that if he could find a place nearby for sale he would buy it and Gould could live on it as a tenant under a crop rental arrangement. The land which Felix devised to the

Goulds was a farm known as the Ballston place, which Felix purchased in the carrying out of this arrangement and on which the Goulds were living at the time of Felix's death. It is evident from the testimony that there was a close relationship and a feeling of warm friendship between Felix and Robert Gould, and this benefaction to his friends is not to be overlooked in considering the question whether the will was unnatural or otherwise.

It is argued in contestant's brief that the testimony of Mr. Shetterly should be given little, if any, credit because he violated Canon 19 of the Canons of Professional Ethics of the American Bar Association by participating in the trial of this case in the Circuit Court, notwithstanding the fact that he was a material witness and knew that he would be called to testify before the trial commenced. We might dispose of the contention by saying that, were Mr. Shetterly's testimony to be disregarded altogether, we would still be of the opinion from all the other evidence in the record that the testator was competent to make a will and that the will in question was his own free and voluntary act.

■ As pointed out by Mr. Justice Tooze in the opinion in *Oxley et al v. Linnton Plywood Association,* this day rendered, this court will not condone violation by an attorney of Canon 19 in the Circuit Court by permitting the offending attorney to argue the appeal of the case in this court. The Canons of Professional Ethics of the American Bar Association have been approved by the Oregon State Bar, of which all Oregon lawyers are members, and the substance of Canon 19 has been adopted as a rule of this court. See *Newman v. Stover,* 187 Or 641, 657, 213 P2d 137; Rule 18, Rules of Procedure of the Supreme Court of the State of Oregon. The case of *In re Torstensen's Estate,* 28 Wash2d 837, 184 P2d 255, which reviews decisions of

numerous other courts of last resort on this subject, is commended to the profession, as well as to circuit judges, who have a responsibility equal to ours in the enforcement of this salutary rule of conduct for lawyers.

The courts which have had occasion to discuss the subject have severely criticized attorneys who appear in the dual role of material witness and advocate, and some have gone so far as to condemn testimony given under such circumstances as ''entitled to little or no weight or credit.'' *McKey v. McKean,* 384 Ill 112, 51 NE2d 189. Another court has said: ''The practice of attorneys of furnishing from their own lips and on their own oaths the controlling testimony for their client is one not to be condoned by judicial silence * * * nothing short of actual corruption can more surely discredit the profession.'' *Ferraro v. Taylor,* 197 Minn 5, 12, 265 NW 829, 833. It is unnecessary to multiply quotations. Similar expressions may be found in the *Torstensen case,* supra, and in the opinions from which the Washington court has there quoted at length.

In the present case Mr. Shetterly appeared in the Circuit Court as counsel for the defendants Gould and the executor; the defendants Mischel were represented by Mr. Asa L. Lewelling, who in this court was sole counsel for all the defendants. In the Circuit Court Mr. Lewelling carried the larger share of the burden for the defense, though Mr. Shetterly cross-examined most of the witnesses for the contestant and examined several of the witnesses for the defendants. He is a young attorney of good standing and unquestioned reputation, and may never have heard of Canon 19. After the appellant's brief was filed here Messers Rhoten, Rhoten and Speerstra, who appear on that brief with counsel from the state of Washington, addressed a letter to the clerk of this court in which they

disclaimed any intention to attack Mr. Shetterly or to charge him with unprofessional conduct. The letter concludes: "The argument [with reference to Canon 19] is intended to distinguish this case from that line of cases which suggest that the testimony of the attorney drawing the will should be given great weight, or greater weight than given the testimony of other witnesses. Mr. Shetterly is held in the highest regard by us and he is known by us to be an ethical as well as a competent practitioner."

Of course, this generous tribute from opposing counsel cannot absolve Mr. Shetterly from a breach of Canon 19. It does, however, indicate their belief that he was a truthful witness. We may lay entirely to one side his opinion as to the testator's competency, but we cannot disregard his testimony as to what occurred during his interview with the testator. It is fortified by a memorandum in evidence, which he made at the time, containing the information which the testator gave him concerning his age, his heirs, and the disposition he wished to be made of his property. The memorandum includes notations of the numbers of the tax receipts which the testator brought with him, specifically designating the receipts which covered the lands to be devised to the Mischels and those which covered the lands to be devised to the Goulds.

■ In the particular circumstances of this case we cannot say that Mr. Shetterly's testimony is not entitled to credit. It must be understood, however, that in so holding we do not relax in the slightest degree our attitude towards a violation of Canon 19.

The contestant assigns error in her brief to the admission of testimony of witnesses on behalf of the defendants that in their opinion the testator was competent. With the exception of one or two instances,

all this testimony came in without objection. Apart from that, the testimony was properly received. It was given by witnesses to the execution of the will and by others who were sufficiently well acquainted with the testator to qualify them to express their opinions upon the subject. See ORS 41.900 (10).

The decree of the Circuit Court is affirmed. No costs or disbursements will be allowed.