Argued and submitted March 11, reversed and remanded November 3, reconsideration denied December 29, 1993, petition for review denied February 22, 1994 (318 Or 381)

In the Matter of the Estate of
Mildred Hedvig Smith, Deceased.

Earl J. KNUTSEN,
*Appellant,*

*v.*

Arnold KRIPPENDORF,
as Personal Representative of the Estate of
Mildred Hedvig Smith, Deceased,
and Arnold Krippendorf, in a personal capacity,
*Respondent,*

*and*

Vanessa Darlene SHIRTS
and Charles Shirts,
*Third-Party Defendants.*

(P92-005; CA A75758)

862 P2d 509

William E. Loose argued the cause for appellant. With him on the briefs were Gary M. Bullock and Bullock & Regier, P.C.

Blair J. Henningsgaard argued the cause for respondent. With him on the brief was Brownhill & Henningsgaard.

Before Deits, Presiding Judge, and Riggs and Durham, Judges.

DEITS, P. J.

**DEITS, P. J.**

Contestant Earl Knutsen, disinherited under the will of his deceased mother, Mildred Smith, seeks to have the will declared invalid. He contends that the trial court erred when it held that her will was not the product of either undue influence or insane delusions. We review *de novo*, ORS 19.125(3); *Sanders v. U.S. National Bank,* 71 Or App 674, 694 P2d 548, *rev den* 299 Or 31 (1985), and reverse.

Smith died on January 5, 1992, at age 86. She had been married three times and had raised two sons and a step-daughter. She was survived by her son Earl Knutsen, her daughter-in-law Kathy Knutsen, her step-daughter Vanessa Shirts and several grandchildren, including children of a deceased son. In 1981, Smith, then age 76, moved from Portland to Astoria. That same year, Arnold Krippendorf, then age 56, left his second wife and moved in with Smith.[1] Krippendorf testified that he brought nothing with him nor did he ever pay rent. The evidence is conflicting as to what assets he had and what financial contributions, if any, he made to the relationship. During at least some of the time that Smith and Krippendorf were together, he worked three days a week at a car rental business. In a deposition taken less than three weeks before the disputed will was executed, Knutsen testified that Krippendorf's name previously had been substituted for Shirts's on Smith's joint account and had been added to Smith's car title. Krippendorf did all of Smith's banking, managed her finances and received at least one loan from Smith that may not have been repaid. In addition, although Krippendorf testified that he told Smith that she would receive his entire estate under his 1987 will, his will actually made gifts of $5000 to each of five beneficiaries before giving the residue of the estate to Smith.

Smith and Krippendorf lived together for several years as if they were married, and disinterested witnesses testified that, at least before 1989, they appeared to be happy together. Between 1981 and 1987, Krippendorf cared for Smith during her recuperation from two hip replacement operations and two cataract operations. During 1988, Smith

---

[1] Krippendorf and his wife were divorced in 1986.

expressed to two close friends her dissatisfaction with Krippendorf, specifically citing his drinking and their lack of money. In September, 1988, she called the police and asked that he be removed from her house. Upon discovering that Krippendorf lived there, the police took no action. Krippendorf testified that, by the next day, Smith had forgotten that she had made the call. In November, 1988, Smith's family spent Thanksgiving at Shirts's home in Newport. At that time, Smith asked Knutsen for help in getting Krippendorf out of her house, again mentioning his drinking. In response, Knutsen initiated guardianship proceedings and, in late December, was named Smith's temporary guardian and conservator.

In early January, 1989, Krippendorf was served with the guardianship papers and was given 30 days to move out of Smith's house. Knutsen brought Smith to Portland to stay with him and his wife, although this was not intended to be a permanent living arrangement. After Krippendorf moved out of Smith's house in early February, the Knutsens moved some of Smith's belongings to Portland. While in Portland, Smith continued to be under the care of a physician, and her daughter-in-law, who is a registered nurse, gave Smith her prescribed medications. During this time, Smith was increasingly confused and disoriented and, at times, had significant problems with her memory. At other times, however, she acted as she always had.

According to the Knutsens and their neighbor, Laurette Barondess,[2] during her stay in Portland, Smith did not want to either see or speak with Krippendorf, and she often complained that he had stolen from her. Krippendorf testified that Smith was prevented from speaking to him on the phone but that, on the two occasions that they did speak, Smith wanted him to come and take her home. Knutsen testified that Smith had unrestricted use of the phone and had called Krippendorf at least once, but that Krippendorf never called Smith. There is no other evidence that, while she was in

---

[2] Barondess lived next door to the Knutsens and spoke with Smith on a daily basis while Smith was living in Portland. Barondess is a writer, and her testimony was based on notes that she kept during the time that she spent with Smith in Portland and in Astoria. Barondess testified that, because her own mother had suffered from Alzheimer's disease, she wanted to record what was happening to Smith for her use in a story.

Portland, Smith expressed any displeasure at being there or any interest in going back to Krippendorf.

In late February, 1989, in response to Smith's repeated requests, Smith, Knutsen and Shirts went to Knutsen's attorney, Gary Bullock. In that tape-recorded meeting, Smith expressed her opinion about some issues relevant to this proceeding:

"Mr. Bullock:   Okay. Do you feel that your son Earl is trying to steal from you?

"Mrs. Smith:   No.

"Mr. Bullock:   Do you feel your [step-]daughter is trying to steal from you?

"Mrs. Smith:   No.

"Mr. Bullock:   Do you trust them?

"Mrs. Smith:   Yeah.

"Mr. Bullock:   How about Earl — or how about Arnold, do you trust Arnold?

"Mrs. Smith:   No.

"Mr. Bullock:   Why don't you trust Arnold?

"Mrs. Smith:   Because when I first met him, I thought he was a nice man, and after all this time I know he is not.

"Mr. Bullock:   And why do you know he's not a nice man?

"Mrs. Smith:   Well, seeing things and hearing things. Astoria isn't a very big town.

"(* * * * *

"Mr. Bullock:   * * * [Y]ou're not under — you're not afraid of me, are you?

"Mrs. Smith:   Oh, heavens no.

"Mr. Bullock:   And you're not under any —

"Mrs. Smith:   No.

"Mr. Bullock:   — force or anything in here in my office?

"Mrs. Smith:   No, no.

"Mr. Bullock:   All right. Thank-you Mildred.

"Mrs. Smith:   Thank-you, sir, for helping me.

"Mr. Bullock:   You're welcome.

"Mrs. Smith:   I hope you get him out of the house down there (unintelligible)."

Smith also stated that she did not mind living in Astoria but that she did not want to live with Krippendorf. The attorney next discussed Smith's then-current will drafted by attorney Louis Larson in 1987. After she was told that Krippendorf would share in her estate, the following colloquy took place:

"Mr. Bullock:   Okay. Now, Mildred, is that what you want?

"Mrs. Smith:   No.

"Mr. Bullock:   Do you want Arnold to have anything of yours?

"Mrs. Smith:   I don't want him to get so much as a shoestring.

"* * * * *

"Mr. Bullock:   Because right now the way the will is, it would go to — most of it evidently would go to Arnold.

"Mrs. Smith:   Oh, God.

"Mr. Bullock:   You don't want it going to Arnold?

"Mrs. Smith:   I don't want him to have so much that he can put into his eyeball."

Bullock and Smith then discussed a new will that would divide the estate between Knutsen and Shirts. On April 3, 1989, Smith executed a will giving her entire estate to Knutsen.

From approximately April 3 to April 6, 1989, Smith, the Knutsens and Barondess stayed at Smith's house in Astoria, at her request, to clean out her things and prepare the house for sale. According to the witnesses' testimony, Smith expressed concern that her belongings would be stolen if left in the house. Because of this, most of her remaining possessions were packed up and taken to the Knutsens' house for storage. Barondess testified that, while at the house, Smith repeatedly stated that Krippendorf had "stolen her blind," that he was trying to kill her and that she wanted to go "home." All three witnesses claimed that Smith would follow them from room to room to avoid being left alone. At that time, she also experienced periods of confusion during which

she did not know where she was. She continued to have problems with her memory.

Some time after he was served with the guardianship papers, Krippendorf filed a motion to have Knutsen removed as Smith's guardian and conservator. Krippendorf requested that he be named as guardian. A hearing was set for April 10, 1989. On Friday, April 7, 1989, Krippendorf, Knutsen and Smith were deposed at the offices of Krippendorf's attorney. During the depositions, Krippendorf sat across the table from Smith, blowing kisses at her and mouthing the words "I love you." Smith testified that she wanted to move back to Astoria, that she needed a guardian because she did not want to live alone, but that she was not sure who she thought her guardian should be. Krippendorf's attorney asked her several times if she wanted to live with Krippendorf, and each time she responded, "I don't know." Near the end of the attorney's questioning, Smith testified:

"Q   Do you want Arnold to act as your guardian?

"A   I don't know.

"Q   Do you want Earl to act as your guardian?

"A   I really don't know. Why can't you be my guardian? (Indicating to [Krippendorf's] Counsel, Mr. Henningsgaard.)

"* * * * *

"THE WITNESS:   Well, when Arnold did live with me, he was good in a lot of ways to me, I will say that for him, but then, again, I have a son and he is good too. Of course, we argue once in awhile, like all parents and children do, but I really don't know."

At the conclusion of the depositions, Smith, after a brief conversation with Krippendorf, stated that she wished to leave with him.

According to Krippendorf's testimony at trial, he and Smith spent the entire weekend at his apartment where Smith told him how unhappy she had been in Portland and that she did not want to go back with her son. Krippendorf testified that he was with Smith "24 hours a day" during that weekend. On Monday, April 10, 1989, the hearing was held to determine Smith's permanent guardian and conservator. Smith exhibited confusion on some issues, but testified that she wanted to live in her house with Krippendorf as her

guardian and conservator. She stated that it was "not by choice" that she had been living in the Knutsens' house, that she did not trust her son, and that she did not want him to serve as her guardian or as her conservator. She testified:

"Q   Do you think your son should continue to serve as your guardian?

"A   Absolutely not.

"Q   Why is that?

"A   Because I don't trust him.

"* * * * *

"Q   Has [Krippendorf] been good to you?

"A   Yes, very good, better than some of the members of my family."[3]

She repeatedly commented that all her furniture and possessions had been taken from her house. During Knutsen's testimony, Smith frequently interrupted to make accusatory and disparaging comments about him:

"Q   Have you ever known Mr. Krippendorf to be cruel or abusive to your mother?

"A   No, that's one thing I'll say, that he never to my knowledge hurt her.

"MILDRED SMITH:   But you have.

"* * * * *

"Q   Why did you seek to become your mothers's guardian and conservator?

"MILDRED SMITH:   So he can have all the money.

"A   At her request.

---

[3] On cross-examination, Knutsen's attorney asked Smith about her deposition taken before she spent the weekend with Krippendorf:

"Q  Do you also remember saying that you didn't know who you wanted to be your guardian and conservator?

"A  That I didn't know what, sir?

"Q  That you didn't know who you wanted to be your guardian and conservator?

"A  Yes, I want Arnold.

"Q  No, on Friday do you remember what you said? Do you remember what you said on Friday?

"A  No. I don't want my son, if that is what you are after."

"* * * * *

"Q   And how, if at all, are you willing to continue to serve as her guardian and conservator?

"A   I would be more than willing to take care of her as I have for the last three months.

"MILDRED SMITH:   I don't want it.

"* * * * *

"Q   What emotions do you have for your mother:

"A   Well, I love my mother and I care for her a great deal, and I hate to see something go bad with her.

"MILDRED SMITH:   You love money."

The trial court found Smith competent to express her preference for a guardian and, because she preferred Krippendorf, the court appointed him as her guardian. Lyndstad was appointed conservator. At the conclusion of the hearing, Smith told her son that she never wanted to see him again.

Within a few days after the April 10 hearing, Krippendorf called attorney Larson to schedule an appointment for a new will. On Friday, April 14, 1989, Krippendorf took Smith to Larson's office, and a will was drafted naming Krippendorf sole beneficiary of Smith's estate. Larson, who had testified at the guardianship hearing and knew Krippendorf had been appointed guardian, testified at trial that Smith was adamant about disinheriting her family. He said that Smith told him that she would not have survived another week in Portland because of the medication her daughter-in-law was giving her, that her son and daughter-in-law had stolen her property from her house and refused to return it, that Shirts had taken things from her, and that all of them had hurt her feelings. Larson also testified that Smith was not at all confused about what she was doing and expressed herself as she always had. Larson was unaware that Smith had just executed a will on April 3, 1989 or that a conservator had been appointed for her. The new will was executed on April 24, 1989.

From April of 1989 to mid-1991, Krippendorf lived with Smith and served as her guardian. Until at least 1990, Smith refused to be left alone and spent "24 hours a day"

with Krippendorf. She told several people, including Krippendorf, that she had been unhappy living in Portland, that her son had stolen from her, that he had tried to kill her, and that she feared he would come to get her. Following a 1991 knee operation, she suffered complications which required additional hospitalizations and further required that she use a wheelchair. During one of those hospitalizations, Smith's admission was to be confidential, although the evidence is conflicting as to whether Smith or Krippendorf made this request. Knutsen, who had had no contact with his mother since the guardianship hearing, found out about the hospitalization and visited her. Following that visit, she called him and asked that he visit her again.

In mid-1991, Smith told her visiting nurse that Krippendorf was verbally and sexually abusing her. Although Smith later did not recall making the statements, the court appointed Shirts to replace Krippendorf as Smith's guardian. In October, 1991, Shirts arranged to admit Smith to a nursing home, with the instructions that only she and Knutsen be allowed to visit. Smith died on January 5, 1992, leaving an estate valued at approximately $85,000.

Knutsen assigns error to the trial court's finding that Krippendorf did not exert undue influence over Smith when she executed her will. The burden of proving undue influence is usually on the contestant of a will; however, certain circumstances "may justify a suspicion of undue influence so as to require the beneficiary to go forward with the proof and present evidence sufficient to overcome the adverse inference." *In re Southman's Estate*, 178 Or 462, 482, 168 P2d 572 (1946). The party asserting undue influence first must prove that a confidential relationship existed between the testator and the beneficiary, such that the beneficiary held a position of dominance over the testator. *Doneen v. Craven*, 204 Or 512, 522, 284 P2d 758 (1955). Next, the contestant must establish the existence of suspicious circumstances surrounding the procurement or execution of the will. *In re Reddaway's Estate*, 214 Or 410, 329 P2d 886 (1958); *McKee v. Stoddard*, 98 Or App 514, 780 P2d 736, *rev den* 308 Or 660 (1989). If a confidential relationship and suspicious circumstances are shown, the proponent assumes the burden of producing evidence sufficient to overcome the inference of

undue influence. *In re Southman's Estate, supra,* 178 Or at 482; *O'Brien v. Belsma,* 108 Or App 500, 506, 816 P2d 665 (1991).

■■      Smith and Krippendorf clearly shared a confidential relationship. Additionally, we find that, at the time that the will was executed, Krippendorf held a position of dominance over Smith. Although the evidence suggests that Smith was a "strong-willed" person, a finding of dominance does not require evidence that an authoritative, controlling person bullied or directed the actions of a subservient one. Dominance can be expressed more subtly, such as by suggestion or persuasion or by fostering a sense of need and dependence.

The record here indicates that, as Smith's physical and mental health deteriorated, Krippendorf's dominance over her increased. At trial, two of Krippendorf's witnesses testified that as Smith's health declined, he became the dominant partner in the relationship. At the guardianship hearing, four days *before* the contested will was drafted, Knutsen testified that Krippendorf "has seemingly got a very [*sic*] amount of influence over her, and her possessions" and that Smith "[is] easily taken and persuaded and moved to do things that she wouldn't have done just as recent as last Friday — or last Monday, a week ago today." The drastic change in Smith's attitude toward Krippendorf and toward her son during the course of the weekend that she spent with Krippendorf is indicative of that dominance.

■      As to suspicious circumstances, *In re Reddaway's Estate, supra,* 214 Or at 421-25, lists seven "factors of importance" to consider in deciding if circumstances exist to support an inference of improper influence. The first factor is procurement; that is, participation by the beneficiary in the preparation or execution of the will. Krippendorf testified that he called and scheduled an appointment with attorney Larson at Smith's request, drove her to Larson's office, and escorted her into the office. Larson testified that, because he anticipated a future challenge to the will, he took notes of that meeting in case he needed to refresh his memory at a later date. Although his notes stated "Conference, Mildred, and Arnold present," Larson testified that he recalled asking Krippendorf to leave before any discussion of the will's contents. Krippendorf did participate, at least to some extent, in

the procurement of the will. However, viewed in isolation, his participation was insufficient to support an inference of undue influence.

**6, 7.** Independent advice is also a factor for consideration. When a beneficiary in a confidential relationship with a testator participates in preparation of a will, the beneficiary has a duty to seek disinterested advice for the testator. *In re Reddaway's Estate, supra*, 178 Or at 422. In *McKee v. Stoddard, supra*, 98 Or App at 522, we found the lack of independent counsel to be significant where the beneficiary had scheduled and accompanied the testator to see the beneficiary's attorney, an attorney the testator had never met. The beneficiary never encouraged the testator to contact his own attorney nor did she seek any other source of independent advice for the testator. The record here indicates that Larson was initially Krippendorf's attorney, having handled Krippendorf's 1986 divorce. Although there is no evidence that Krippendorf encouraged Smith to seek advice other than Larson's, Larson had done work for Smith in the past, including preparing a will, a power of attorney and a letter of instruction in 1987 and a codicil and a letter of instruction in 1988. Under the facts, then, the lack of independent counsel is not a controlling factor.

■ The third factor is secrecy and haste surrounding the making of the will. *In re Reddaway's Estate, supra*, 214 Or at 423. Here, there appears to have been some haste. As discussed above, Krippendorf initiated Smith's appointment with Larson within a few days of being named her guardian. The new will was executed just two weeks after the guardianship hearing.

■ The fourth factor is the "unexplained change in the donor's attitude toward those for whom [s]he had previously expressed affection." *In re Reddaway's Estate, supra*, 214 Or at 423. Here, there was a marked change in Smith's attitude toward her son from the time of her deposition on Friday, April 7, to the guardianship hearing on Monday, April 10, after she spent the intervening weekend with Krippendorf. Krippendorf argues that Smith had not been close to her children for several years and that there was no abrupt or noticeable change in her attitude. Several witnesses testified that *after* Smith moved back with Krippendorf, she was

outspoken regarding how unhappy she had been while she lived with the Knutsens, and how she believed that they had stolen from her. However, in contrast to the accusatory statements Smith made about Krippendorf before and during her stay in Portland, there is no evidence that she indicated any unhappiness or distrust of her son and daughter-in-law at that time. Although the quality of Smith's relationship with her children may have fluctuated over the years, we find it significant that Smith's attitude toward Knutsen changed so quickly and so radically after she stayed with Krippendorf for the weekend.

■      The fifth factor to consider is a change in the decedent's plan for disposing of her property. *In re Reddaway's Estate, supra*, 214 Or at 423-24. A will executed by Smith in 1984 made several specific bequests to family members and to Krippendorf, then divided the residue so that Knutsen and Shirts each received 45% and Krippendorf received 10%.[4] Her 1987 will made similar specific bequests, but divided the residue so that Knutsen and Shirts each received 35% and Krippendorf received 30%.[5] Following Smith's apparent change of heart toward Krippendorf, she executed the April 3, 1989 will that gave her entire estate to Knutsen.

Krippendorf argues that the will disinheriting Smith's family is not a radical shift but, instead, reflects a trend of Smith giving an increasingly larger share to him. We disagree. Although the change from 10% in 1984 to 30% in 1987 may represent a gradual increase in Krippendorf's share, the same cannot be said of the change from 30% in 1987 to 100% in 1989. Further, although the amount of Knutsen's gift varied with each new will, Smith's testamentary scheme consistently provided for him. The will at issue thus represents a significant departure from that plan.

---

[4] Under that will, almost all gifts to Knutsen were to lapse if he predeceased Smith or was still married to his wife at Smith's death. Smith did not provide for any grandchildren, although she did name Shirts's surviving children as alternate beneficiaries should Shirts predecease her.

[5] In certain provisions of that will, Smith named Knutsen's "lineal descendants" and Shirts's children as alternate beneficiaries. She specifically named her deceased son's son as an alternate beneficiary in one provision. She acknowledged her deceased son's daughter but made no reference to her as a beneficiary.

■ The sixth factor of importance is that of an unnatural or unjust gift. As the court noted in *In re Reddaway's Estate, supra*, 214 Or at 424-25, a testator has a legal right to dispose of her property as she sees fit. However, an apparently unfair gift, such as one that disregards the natural objects of the testator's bounty, is an indication of undue influence. As discussed above, each time Smith executed a will, she modified the beneficiaries, alternate beneficiaries and/or their respective shares. In June, 1988, she executed a codicil removing Knutsen as the estate's personal representative, and she removed him as the attorney-in-fact under her power of attorney. She did not at that time, however, modify any bequest to him. Thus, Smith's will resulted in "shunting the property away from those who had a reasonable expectation of being the recipients of the donor's bounty," and is at least a suspicious circumstance. *In re Reddaway's Estate, supra*, 214 Or at 426.

■ The final factor to consider, the decedent's susceptibility to influence, is a factor we find quite persuasive. *In re Reddaway's Estate, supra*, 214 Or at 426-27. The evidence shows that, in the few weeks around the time of the guardianship proceedings and the execution of the contested will, Smith was physically ill, on medication, confused, disoriented and suffering from memory loss. Both sides testified that she was afraid to be left alone. We do not disregard the evidence of Smith's reputed strong will and independent nature; however, we are convinced that, at the time that she changed her will, her periods of lucidity were fewer and farther apart than they had been. Consequently, we find that, at that time, Smith's mental and physical condition made her subject to suggestion and influence by Krippendorf.

■ The principle underlying the doctrine of undue influence is that a testator would not have executed a will but for the improper conduct of another. The focus is not on the testator's freedom of will, but

> "on the nature of the influencer's conduct in persuading the testator to act as [she] does. The question is, has the influencer by his conduct gained an unfair advantage by devices which reasonable [people] regard as improper?" *In re Reddaway's Estate, supra*, 214 Or at 419.

We agree that coercion was not involved in the execution of Smith's will; however, coercion is not a necessary prerequisite to a finding of undue influence. As the Supreme Court has explained:

> "Definitions of undue influence couched in terms of the testator's freedom of will are subject to criticism in that they invite us to think in terms of coercion and duress, when the emphasis should be on the unfairness of the advantage which is reaped as the result of wrongful conduct. 'Undue influence does not negative consent by the donor. *Equity acts because there is want of conscience on the part of the donee, not want of consent on the part of the donor.*' " *In re Reddaway's Estate, supra*, 214 Or at 419 (quoting 3 *Modern L Rev*, 97, 100 (1939)). (Emphasis supplied.)

After considering all of the relevant factors, we conclude that suspicious circumstances surrounded the execution of Smith's will. This finding, coupled with the existence of the confidential relationship between Krippendorf and Smith, gives rise to an inference that Krippendorf unduly influenced Smith in executing her will. We further conclude that Krippendorf failed to overcome that adverse inference and that his conduct allowed him to gain an unfair advantage. Accordingly, we hold that the last will of Mildred Smith was the product of undue influence and is invalid.[6]

Reversed and remanded.

---

[6] Because of our resolution of this case, it is unnecessary to address Knutsen's other assignments of error.