Argued and submitted May 3, affirmed October 23, appellant's petition for reconsideration filed November 5, 1996, allowed by opinion January 29, 1997
See 146 Or App 105, 931 P2d 815 (1997)

In the Matter of the Estate of
Evelyn Cochrane, Deceased.

Teresa SANGSTER,
*Respondent,*

*v.*

Dan DILLARD,
Personal Representative of the Estate of
Evelyn Cochrane, Deceased,
*Appellant,*

*and*

SMALL BUSINESS ADMINISTRATION,
an agency of the United States of America,
*Claimant.*

(93-0006-P; CA A85159)

925 P2d 929

Ridgway K. Foley, Jr., argued the cause for appellant. With him on the briefs was Foley & Duncan, P.C.

Brian L. Gingerich argued the cause for respondent. With him on the brief was Karnopp, Petersen, Noteboom, Hubel, Hansen & Arnett.

Before De Muniz, Presiding Judge, and Warren, and Leeson, Judges.

DE MUNIZ, J.

## DE MUNIZ, J.

■ Defendant, Dan Dillard, appeals from a judgment voiding the 1993 will of his mother, Evelyn Cochrane, on the grounds of undue influence. We review *de novo*[1] and affirm.

Defendant is Cochrane's only child. Plaintiff is defendant's daughter by his first marriage and Cochrane's granddaughter. Plaintiff contested Cochrane's 1993 will, which names defendant as sole beneficiary, and sought to probate a 1988 will naming her uncle, her siblings and herself as beneficiaries. Cochrane's estate consists largely of an interest in the Cooper Spur Inn, a remote seasonal resort located on the eastern slope of Mount Hood.

Cochrane was a trailblazer who had an unusual relationship with her son. She left her first husband, defendant's father, when defendant was only a few weeks old. Cochrane achieved success in the cosmetics industry, working her way up from traveling saleswoman to regional director to industry consultant. Defendant rarely saw Cochrane and was raised solely by his father, who died when defendant was 13. Defendant then lived with Cochrane's sister Ruth Pierce and her husband. By then financially independent, Cochrane paid all of defendant's bills. She later married Gordon, and defendant moved in with them at the age of 15. After graduating from high school, defendant was drafted and sent to Vietnam.

Defendant married his first wife, Judy, in 1962. Their three children, plaintiff, Shelly and Dan, are beneficiaries of Cochrane's 1988 will and live in California (hereinafter the California grandchildren). Defendant had divorced Judy by the end of the 1960s, and later married Sharon, his current wife. They had two children, Michelle and Michael, and eventually moved to Hood River, Oregon.

In 1970, Cochrane and Gordon moved to Pomona, California, where Gordon worked as a crane operator. They bought a set of apartments, which Cochrane managed. It was

---

[1] *Knutsen v. Krippendorf,* 124 Or App 299, 301, 862 P2d 509 (1993), *rev den* 318 Or 381 (1994); *Sanders v. U.S. National Bank,* 71 Or App 674, 682, 694 P2d 548, *rev den* 299 Or 31 (1985); ORS 19.125(3).

during this time that Cochrane spent a great deal of time with the California grandchildren, for whom she developed a fondness and affection.

In 1975, Cochrane, Gordon, defendant and his second wife Sharon signed a real estate contract to purchase 160 acres of land on Mount Hood. This eventually became the Cooper Spur Inn. The four purportedly acted as partners in operating the resort, but there are no documents showing a partnership. Defendant testified that he contributed half of the approximately $22,000 down payment, but the trial court found that Cochrane put up all the money.[2]

When Gordon retired around 1979, he and Cochrane moved to Cooper Spur and lived with defendant, Sharon and their two children. In addition to being part-owner, Cochrane baked pies and worked as a waitress in the diner. There were frequent quarrels over management of the resort, particularly over the increasing investments by Cochrane and Gordon and defendant's indebtedness to them. Cochrane once estimated that she had loaned defendant approximately $400,000 for improvement and operation of the resort, not including the down payment.[3] There is no record of defendant paying back any of that money. Cochrane once stated that she had invested in Cooper Spur all but $150,000 of her and Gordon's life savings. At some point, she converted this into cashier's checks, which could not be located at the time of probate.

In 1988, Cochrane executed a will explicitly disinheriting defendant, leaving her entire estate to Gordon and, if Gordon should die first, to her brother and the California grandchildren. At that time, Cochrane said that she had given defendant enough and she wanted the grandchildren in California to inherit all her property. She frequently repeated that desire to numerous people.

---

[2] That same year, Cochrane and Gordon also formed a construction company with defendant in Hood River. Cochrane and Gordon again put up the money, and defendant supplied the equipment. After two or three years, the company failed. Cochrane covered a $60,000 default, and defendant liquidated the equipment.

[3] There were also plans to build a house for Cochrane and Gordon at Cooper Spur. Only defendant's house was built. At trial, defendant estimated its value at $414,000.

In 1989, Cochrane and Gordon sued defendant and Sharon for fraud, in an attempt to recoup their investment in the resort. Cochrane was represented in that suit by Ronald Somers, the attorney who drafted the 1988 will; defendant was represented by Larry Bowe, who later joined defendant in a business venture and for whom Cochrane had expressed distrust. After Gordon died later that year, the lawsuit was dismissed for lack of prosecution.

Cochrane remained at Cooper Spur with defendant, but continued to tell others that their relationship was strained and unpleasant. She reported that she rarely left the mountain because she did not trust defendant and needed to keep an eye on her investment. Cochrane lived in a 400-square-foot apartment above the resort's diner. The only telephone in her apartment was an extension that rang in the restaurant below and in defendant's home, located a few hundred feet away. Because she feared that defendant monitored her calls, Cochrane told relatives and friends not to call her there. Defendant also had access to her mail.

Although witnesses described Cochrane as tough, independent and shrewd, she became more reliant on defendant as her health failed. In 1992, she was diagnosed with a compression fracture in her spine that caused her severe back pain and limited her mobility. She also developed an abdominal aneurysm, which, according to defendant, Cochrane feared could rupture and kill her at anytime. Her physicians, however, did not consider the aneurysm a life-threatening condition. Cochrane had no driver's license and relied almost exclusively on defendant for transportation to the pharmacy, doctor's office, bank, grocery store, hair dresser and all other contacts beyond Cooper Spur.

■ Sometime in February 1993, defendant told Bowe that Cochrane wanted to make a will leaving him all her property. Bowe told defendant that Somers should draft the will, but according to defendant's testimony, Cochrane insisted on Bowe. The trial court, however, did not believe defendant on this point. The court explicitly found that defendant did not pass along Bowe's suggestion to have Somers draft the will and that it was defendant, not Cochrane, who selected Bowe. Although our review is *de novo*, that finding is

based on witness credibility and therefore is entitled to "great weight." *Krueger v. Ropp*, 282 Or 473, 478-79, 579 P2d 847 (1978); *Walls v. Small*, 26 Or App 105, 109, 551 P2d 1310, *rev den* (1976).

On February 8, 1993, about a month before Cochrane's death, defendant faxed Bowe a note written on the back of a Cooper Spur placemat, later determined to be in Cochrane's handwriting. The note stated Cochrane's desire to leave all her property to defendant and to have her body cremated.[4] Bowe told defendant that the note was not a valid will. Bowe was then instructed to draw up a new will. Whether this instruction came from defendant or Cochrane is unclear from the record. Bowe faxed the completed draft back to defendant. The next day, defendant drove his mother to Bowe's office. Bowe testified that she looked ill and weak. While defendant looked on in Bowe's lobby, Cochrane executed the will in the front seat of defendant's truck.[5] There is no indication that either Bowe or defendant advised her to seek independent advice regarding the new will. No one knew about the new will except Cochrane, defendant, Bowe and Bowe's secretary.

Cochrane died about a month later, on March 6, 1993, at the age of 76. Within days, defendant filed a petition to admit the 1993 will to probate. Plaintiff then filed a petition contesting the will and seeking to have the 1988 will admitted. The trial court granted plaintiff's petition and voided the 1993 will. The sole issue on appeal is whether defendant used undue influence in persuading Cochrane to execute that will.

■ Underlying the doctrine of undue influence is the principle that "the law will not permit improper influences to control the disposition of a person's property." *In re Reddaway's Estate*, 214 Or 410, 418, 329 P2d 886 (1958). Although

---

[4] The record also contains a handwritten note dated February 7, 1993, signed by Cochrane. This note directs Somers to "return or destroy all previous wills." There was no evidence, however, that it was ever delivered to Somers or anyone else.

[5] Bowe and his secretary testified that there was snow and ice on the ground, but it is unclear from the record whether this was the reason Cochrane did not execute the will in Bowe's office.

undue influence is difficult to define, the question is generally whether the beneficiary, by his or her conduct, gained an unfair advantage by means that reasonable persons would regard as improper. *Id.* at 419; *Van Marter v. Van Marter*, 130 Or App 500, 503-04, 882 P2d 134 (1994). Undue influence is not the equivalent of coercion or duress; the focus is not so much on the testator's lack of consent as on the alleged influencer's lack of conscience in persuading the testator to act as he did. *Reddaway*, 214 Or at 419-20.

The burden of proving undue influence is on the party contesting the will. *Knutsen v. Krippendorf*, 124 Or App 299, 308, 862 P2d 509 (1993), *rev den* 318 Or 381 (1994). Undue influence is rarely susceptible to direct proof of actual influence on the testator. *Reddaway*, 214 Or at 427; *In re Estate of Urich*, 194 Or 429, 445, 242 P2d 204 (1952). Instead, an inference of undue influence arises where the evidence establishes the existence of a confidential relationship, the beneficiary's dominance over the testator and the presence of suspicious circumstances surrounding execution of the will. *Knutsen*, 124 Or App at 308; *Van Marter*, 130 Or App at 504; *O'Brien v. Belsma*, 108 Or App 500, 505, 816 P2d 665 (1991). The will's proponent then bears the burden of producing evidence negating that inference. *McNeely v. Hiatt*, 138 Or App 434, 440-41, 909 P2d 191, *adhered to on recon* 142 Or App 522, 920 P2d 1150 (1996); *Knutsen*, 124 Or App at 308-09; *O'Brien*, 108 Or App at 505-06.

Defendant concedes the existence of a confidential relationship, but argues that no evidence established his dominance over Cochrane. Dominance does not necessarily require proof of an authoritative, controlling person bullying or directing the actions of a subservient one. It may exist more subtly "such as by suggestion or persuasion or by fostering a sense of need and dependence." *Knutsen*, 124 Or App at 309.

We have found dominance where the testatrix is isolated from the outside world and relies almost exclusively on the beneficiary to meet her daily needs. *Carlton v. Wolf*, 21 Or App 476, 477, 483, 535 P2d 119 (1975) (beneficiary routinely bathed and helped into bed elderly testatrix, who lived alone,

had broken hip and suffered from variety of health problems); *see also Wismer v. U.S. National Bank*, 112 Or App 650, 651 and n 2, 829 P2d 1052 (1992) (beneficiary lived alone with testator, provided transportation and did chores, yard work and cooking); *In re Estate of Elise Rosenberg*, 196 Or 219, 232, 246 P2d 858 (1952) (beneficiary tended to all personal needs, took care of correspondence and was sole companion to ill, bedridden testatrix).

■ Here, Cochrane lived on an isolated part of Mount Hood in a tiny apartment above the Cooper Spur diner. Defendant's home was the only other permanent nearby residence. In her final years, Cochrane's back problems caused her severe pain and required frequent trips to the doctor and pharmacy. Because she could not drive, Cochrane relied almost exclusively on defendant for rides to pick up food and medication, to see her doctors and to conduct all other personal business off the mountain. Not only was Cochrane physically isolated, she believed that she lacked a private means of communicating with anyone outside Cooper Spur. She feared using the telephone because of defendant's easy access through the extension.

The fact that witnesses described Cochrane as a fiercely independent and quick-witted woman most of her life does not mean she was immune to a sense of need and dependence as her health failed. *See Knutsen*, 124 Or App at 309 (although testatrix was "strong-willed," dependence increased as her mental and physical health declined); *Carlton*, 21 Or App at 485 (same). Although aiding his elderly mother is commendable, defendant nonetheless fostered a sense of "need and dependence," as demonstrated in *Carlton*, *Wismer* and *Rosenberg*. Such conduct by itself is not enough to question the 1993 will. Only when combined with defendant's less innocent behavior surrounding the will's execution do his actions become suspect.

■ Cochrane's extreme change in attitude toward defendant and the California grandchildren, as apparent from the disposition in the 1993 will, is also indicative of defendant's dominance over her. Although a "change in attitude" toward beneficiaries is one of the seven suspicious circumstances set out in *Reddaway*, 214 Or at 423, it may also demonstrate

dominance. *See Knutsen*, 124 Or App at 309 (drastic change in testatrix's attitude toward son and new beneficiary indicates beneficiary's dominance over testatrix). Up until a month before her death, Cochrane repeatedly told friends, relatives and acquaintances that she intended to leave all her property to the California grandchildren. In the 1993 will, however, she made no mention of her grandchildren and left the entire estate to defendant.

Finally, dominance is found where the testator is guided by the beneficiary's judgment and advice in the period leading up to execution or destruction of a will. *Reddaway*, 214 Or at 421. The trial court found, and we agree, that it was defendant who selected his own attorney and business partner, Bowe, to draft the new will. Somers, Cochrane's former lawyer who had drafted her 1988 will and represented her in the fraud action against defendant, was not consulted. Cochrane previously had expressed distrust of Bowe. By accompanying defendant to Bowe's office, she apparently succumbed to her son's judgment and advice.

Although the record contains no direct evidence of defendant's dominance, undue influence is ordinarily established by circumstantial evidence. *Reddaway*, 214 Or at 427; *Urich*, 194 Or at 445. Based on the factors mentioned above, we conclude that plaintiff has established the existence of a confidential relationship such that defendant occupied a position of dominance over Cochrane.

Where such a confidential relationship exists, "slight evidence" of suspicious circumstances is sufficient to raise an inference of undue influence. *Reddaway*, 214 Or at 420; *McNeely*, 138 Or App at 441. These circumstances include:

> "(1) the participation of the beneficiary in the preparation or destruction of the will; (2) the lack of independent and disinterested advice regarding the will; (3) secrecy and haste in making the will; (4) an unexplained change in the donor's attitude toward those for whom he or she had previously expressed affection; (5) a change in the testamentary plan that ignores the natural objects of the testator's bounty or disregards the continuity of purpose running through former testamentary dispositions; (6) an unnatural

or unjust gift, and (7) the donor's susceptibility to influence." *Van Marter*, 130 Or App at 504, *citing Reddaway*, 214 Or at 421-26.

We find several of these circumstances here. First, defendant participated in the preparation of the 1993 will. Defendant chose Bowe, his own lawyer and business partner, to draft the new will; he initiated contact with Bowe, faxed him Cochrane's handwritten draft, drove Cochrane to Bowe's office the next day, and watched from the lobby as the will was executed in his pick-up truck. *See McNeely*, 138 Or App at 438, 441 (procurement found where beneficiary personally contacted attorneys and provided all necessary information for revising testator's will); *cf. Doneen v. Craven*, 204 Or 512, 523, 284 P2d 758 (1955) (no procurement merely by driving testator to attorney's office and looking on during execution of will, where beneficiary did not select attorney and testator received independent advice).

Second, as a beneficiary who was involved in a confidential relationship with Cochrane and who had participated in the procurement of her will, defendant had a duty to help her seek independent and disinterested advice. *Reddaway*, 214 Or at 422; *Knutsen*, 124 Or App at 310. On this record, defendant breached that duty. Bowe was in no position to give disinterested advice. He had previously represented defendant in a lawsuit against Cochrane and was currently involved in a business venture with defendant. Although Bowe suggested that Somers draft the new will, neither Bowe nor defendant passed that suggestion on to Cochrane directly, nor did they urge her to seek advice from anyone else. *See McKee v. Stoddard*, 98 Or App 514, 522, 780 P2d 736, *rev den* 308 Or 660 (1989) (lack of independent advice is significant where beneficiary took testator to beneficiary's own attorney and never encouraged testator to seek advice elsewhere).

The lack of independent advice is not controlling where the attorney drafting the will previously has done work for both the beneficiary and the testator. *Knutsen*, 124 Or App at 310. Although Cochrane talked with Bowe in 1988 about drafting a will, she never followed through on it. Balanced against Bowe's extensive involvement with defendant,

the amount of legal advice Bowe provided Cochrane in 1988 was insignificant. We agree with the trial court that Bowe was primarily defendant's attorney.

Third, the 1993 will was executed in secrecy and haste. Cochrane had previously told several people about the 1988 will and her desire to leave her property to the California grandchildren. However, no one but defendant, Cochrane, Bowe and Bowe's secretary knew of the 1993 will until after defendant attempted to probate it. Cochrane's secrecy surrounding her second will is suspicious when she so publicly aired the contents of her first.

Furthermore, within 24 hours of faxing Cochrane's handwritten note to Bowe, defendant had Cochrane sitting in the cab of his pickup truck in front of Bowe's office executing a new will. Defendant attempts to explain the haste in execution by claiming that Cochrane feared imminent death from the aneurysm.[6] However, we have only defendant's word on that, and the trial court doubted defendant's credibility on a number of points. None of Cochrane's physicians indicated that the aneurysm was life threatening, and no other witnesses acquainted with Cochrane at that time recalled her expressing such fears.

Fourth and fifth, the 1993 will drastically altered Cochrane's testamentary disposition, which indicated a change in attitude toward beneficiaries for whom Cochrane had previously expressed affection. The 1988 will left the bulk of Cochrane's estate to the California grandchildren, while explicitly disinheriting defendant. The 1993 will provided for the opposite disposition with no mention of the grandchildren. That in itself is a suspicious circumstance.

Defendant argues that the change in disposition resulted from the estranged relationship between Cochrane and the California grandchildren in later years. According to defendant, Cochrane resented not being invited to plaintiff's wedding in 1992, as well as the failure of the California grandchildren to attend Gordon's funeral or to visit her in the years before her death.

---

[6] The death certificate originally listed the cause of death as "probable abdominal aneurysm rupture," but was later corrected to read "codeine overdose."

The grandchildren, however, testified that they stayed away from Cooper Spur because of their fractious relationship with their father. Plaintiff stated that Cochrane was not invited to the wedding because plaintiff feared defendant would show up and create a scene, as he had done at her sister Shelly's wedding years before. The grandchildren also testified that Cochrane understood and accepted that explanation. The trial court explicitly believed the grandchildren and doubted defendant on these points. As a credibility determination, we defer to that finding. *Krueger*, 282 Or at 478-79; *Walls*, 26 Or App at 109. We believe, as did the trial court, that it is more likely than not that Cochrane's change of heart, if any, resulted from defendant's influence.

Finally, as discussed under the "dominance" element above, Cochrane's failing health made her susceptible to influence by defendant, upon whom she relied heavily for her daily needs.

We find sufficient evidence of suspicious circumstances to raise an inference of undue influence. Defendant employed secrecy, haste, and used his own attorney and business partner to draft a new will making him sole beneficiary of his mother's estate, where her previous will had completely disinherited him. Coupled with his failure to seek independent advice, that constitutes an unfair advantage by means that reasonable persons would regard as improper. *Reddaway*, 214 Or at 419. On *de novo* review, we conclude that defendant produced insufficient evidence negating that inference. Accordingly, the trial court correctly invalidated the 1993 will on the grounds of undue influence.

Affirmed.