Argued and submitted December 22, 1999, reversed and remanded on appeal with instructions; affirmed on cross-appeal March 22, 2000

John RAMSEY, Jr.
*Respondent - Cross-Appellant,*

*v.*

Melody TAYLOR
and First Interstate Bank,
*Appellants - Cross-Respondents,*

*and*

SMITH-BARNEY,
Valley of the Rogue Bank,
John Ramsey III, and Ron Ramsey,
as Guardian Ad Litem for
Leslie Ramsey and Cody Ramsey,
*Defendants,*

*and*

Nan MAY,
*Defendant - Cross-Respondent.*

(95-3572-E-2; CA A101655)

999 P2d 1178

David B. Paradis argued the cause for appellant - cross-respondent First Interstate Bank. With him on the briefs were Thaddeus G. Pauck and Brophy, Mills, Schmor, Gerking & Brophy, LLP.

Joel B. Reeder argued the cause and filed the briefs for appellant - cross-respondent Melody Taylor.

Thomas C. Howser argued the cause for respondent - cross-appellant John Ramsey, Jr. With him on the brief was Thomas C. Howser, P.C.

No appearance for cross-respondent Nan May.

Before De Muniz, Presiding Judge, and Haselton and Wollheim, Judges.

DE MUNIZ, P. J.

## DE MUNIZ, P. J.

Defendants Melody Taylor and First Interstate Bank appeal from a judgment of the trial court setting aside in part the last will and testament and *inter vivos* trust of John C. Ramsey, Sr. (Senior) on the ground that Taylor exerted undue influence over Senior. Plaintiff John Ramsey, Jr., (John II), cross-appeals from several aspects of the court's decision as well. We review *de novo*, ORS 19.425(3), and reverse on appeal and affirm on cross-appeal.

Plaintiff initiated this action to invalidate the terms of Senior's last will and *inter vivos* trust, to invalidate and set aside all transfers made by Senior in the final months of his life to Taylor, and to have those assets made a part of the intestate estate of Senior. Defendants include Taylor, the primary beneficiary under Senior's last will and trust, First Interstate Bank, the trustee of the trust, and the remaining trust beneficiaries: John Ramsey III (John III) and Ron Ramsey, both of whom are John II's sons, Leslie and Cody Ramsey, both of whom are great-grandchildren of Senior,[1] and Nan May, a niece of Senior's deceased wife. Plaintiff further sought a declaration that Taylor was not entitled to any share in Senior's estate pursuant to ORS 112.455, on the ground that Taylor had feloniously slain Senior by administering morphine to him.

After trial, the court issued an opinion concluding that Taylor did not feloniously kill Senior but that Taylor did exercise undue influence over him. The court set aside most of the transfers made by Senior to Taylor in the last months of his life and also invalidated Senior's last will and trust to the extent that it benefitted Taylor. The court, however, concluded that the last will and trust remained valid insofar as the remaining beneficiaries were concerned. The court therefore concluded that the bequests and transfers to Taylor should pass to John II pursuant to the laws of intestate succession but that the remainder of the estate should pass to

---

[1] Default judgments were entered against the Ramsey defendants. John III testified at trial that, although named as defendants, he and defendant Ron Ramsey have a verbal agreement with plaintiff John II that John II will split any money he receives as a result of this suit with John III, Ron and their children.

the other beneficiaries pursuant to the terms of Senior's last will and trust.

On appeal, First Interstate and Taylor assign error to the trial court's conclusion that Taylor exercised undue influence over Senior in regard to the execution of his last will and trust and to the court's conclusion that Taylor exercised undue influence over Senior in regard to certain lifetime transfers made to Taylor. On cross-appeal, John II argues that the trial court erred in failing to set aside all lifetime transfers made to Taylor by Senior and in failing to invalidate the final will and trust in their entirety and to allow Senior's entire estate to pass to him through intestate succession.

On *de novo* review, we find the following facts pertinent to our legal analysis. For the most part, we recite the facts chronologically. Senior's wife died in 1984. At that point, he was living in California. After his wife's death, Senior suffered from depression and alcoholism but received treatment and greatly reduced his drinking. Shortly after his wife's death, Senior befriended a teenaged girl, Jill Brogdon, who provided housekeeping services for him and helped him with correspondence. He assisted Brogdon in paying for college and remained friends with her throughout the remainder of his life. At trial, Brogdon testified that, when she worked for Senior in the late 1980s, he had

> "a lot of negative things to say about his family. He was very bitter towards them. He said they were dishonest; that all they wanted was his money; that they had stolen from him in the past; and that they didn't come and visit him; and that he didn't trust them."

She further testified that Senior instructed her to hide his checkbooks and credit cards before his family came to visit, because his grandsons had stolen his checks and credit cards in the past. She indicated that Senior had received letters from family asking him for money and would dictate "nasty letters" to those relatives, sometimes providing them with funds, but also threatening to cut them out of his will or to reduce the amount of money he was leaving them. He was particularly angry at a granddaughter, Joanne Davis. Throughout the time Brogdon worked for Senior in the mid-

to-late 1980s, he instructed her to write out revisions to his will on several occasions.

In 1989, Senior moved from California to Oregon. One of his reasons for moving was so that he could hunt and fish with his son and grandsons. Senior bought a house in which he lived with his grandson, John III, and John III's family. John III was under the impression that Senior was buying the house for John III, but then discovered that Senior intended to live there also. Senior lived in that house from 1989 to 1991. In 1990, Senior's granddaughter Joanne Davis also moved into the house with her family. Also in 1990, Senior was admitted to Ashland Community Hospital with gastrointestinal problems. Hospital records indicated: "Patient lives with his grandson. Apparently his grandson is quite disruptive, very demanding, threatening, and is a big emotional problem to the patient."

In late 1990, Senior executed a will leaving his estate to a trust created at the same time. Under the terms of that trust, 30 percent of the estate was to go to John II, 30 percent was to go to Ron, 20 percent was to go to John III, 10 percent was to go to Joanne Davis, and 10 percent was to go to his granddaughter Jeri Zabel.

John III and his family were unhappy with the living arrangements and wanted Senior and the Davis family to leave the house. Eventually Senior found another place for Davis and her family to stay, and, in 1991, also moved out himself, signing over the title of the house to John III and his wife.

Senior then bought the house in which he lived until his death. John II moved in with Senior, but they had trouble getting along. Senior was angry at John II because John II was not taking care of himself but was living off disability pay. Both John II and his half-sister, Betty Kasser, testified at trial that they believed that Senior had bought the house for John II. John II moved out of the house due to his disagreements with Senior.

In July 1991, Senior amended his trust to disinherit his grandsons John III and Ron, apportioning the 50 percent of the estate that previously had been bequeathed to them to

the children of Joanne Davis and Jeri Zabel. In September 1991, shortly after John II moved out of the house due to their disagreements, Senior further amended the trust to disinherit John II as well, leaving the entire amount to his granddaughters Zabel and Davis and their children.

After John II moved out of Senior's house, Senior had a series of women companions who took care of the house for him and helped him with his business affairs, and/or had intimate relationships with him. Senior had his granddaughter Davis living with him for part of the time. Senior also gave money to his granddaughter Zabel. John III told Senior: "Why are you giving her money? She's ripping you off." Senior also gave a car to Jeannie Parker, who apparently was an illegitimate grandchild of Senior. After Parker wrecked the car, John III told Senior not to give her money to buy another car. Senior also befriended a woman named Karen Dixon, another woman named Mary Jo Estrada, and a woman named Philomena King. John III consistently advised Senior not to give money away to these women and indicated his belief that the women were taking advantage of Senior. Others, including his attorneys and one of his physicians, noted that Senior often bestowed valuable gifts on his female companions.

In mid-1993, Senior entered into a relationship with Mary Jo Estrada. In the course of his relationship with Estrada, Senior had a new will and trust prepared. Under the terms of that trust, Estrada was to receive 25 percent of the estate, Zabel was to receive 25 percent, John II was to receive 10 percent, John III and Ron were each to receive five percent, and the remainder was to be distributed among Senior's great-grandchildren. Those documents, however, were never executed.

In anticipation of Estrada moving into his residence with him, Senior transferred the title to real property and a mobile home to Estrada. Estrada testified that Senior wanted her added to the title of his property because "he had an attitude towards his family that he just didn't feel like they catered to him enough." In August 1993, Estrada and Senior went on a vacation together to Hawaii. Senior became annoyed with Estrada when she refused to sleep with him

during that trip. When Estrada failed to move in with him, Senior hired an attorney to rescind the property transfers. Estrada reconveyed the property and mobile home to Senior. Senior's attorney also sought to recover $8,500 from Estrada after Senior had given her a check for that amount to have her teeth fixed. However, Senior later decided not to pursue recovering the $8,500 from Estrada.

Beginning in 1993, Philomena King worked for Senior as a housekeeper and bookkeeper. She assisted him until May 1995, when she was hurt in a car accident. During the course of their association, Senior gave her title to a car, paid a number of bills for her, and had a heat pump installed in her house. In total, Senior gave her approximately $50,000 in cash and gifts.

In late 1994, Senior executed a new will and trust, leaving 36 percent to John II, 14 percent each to John III, Ron, and Philomena King, three percent each to Joanne Davis and Nan May, and the remainder in various amounts to Senior's Davis and Ramsey great-grandchildren. John Curtis, the attorney who prepared the will and trust, testified that Senior was not pleased with John II, because John II had been asking Senior for large sums of money over the course of time and because John II was not working. Senior told his family about the bequest to King. John III asked him why he was giving King so much money.

Wendy Ramsey, wife of Senior's grandson Ron, testified that Senior liked to have women around and freely spent money on them and that she had told a police officer that Philomena King was using Senior for his money and not doing any housework. She further testified that Senior had tried to use his money to influence family members and had told the family on numerous occasions that he was changing his will. Senior's grandson, Ron, testified that he "didn't want to see [Senior] squander his money away, and didn't want him to get taken advantage of." Ron testified that he believed that Senior gave things to women who were not family members because he was senile.

Beginning in about August 1994, Senior received volunteer counseling services through the Age Wise program to help homebound seniors. His counselor, Gordon, stated

that Senior was upset that his family did not help him with the house and yard and that they were only interested in his money.

During the winter of 1994 to 1995, Senior regularly went for coffee at a restaurant with John II and some of his friends. One of John II's friends testified that Senior and John II appeared to get along pretty well at first but later became more argumentative. He also testified that Senior's clothes were tattered and unsanitary and that his hygiene was poor. Senior told the Age Wise worker Gordon that the only reason John II took him to coffee "is because I pick up the tab." In late spring 1995, Senior met Taylor's sister, Donaldson, at the restaurant where Senior had coffee with John II, some time after King had been injured in a car accident and was unable to help him with household tasks. When Senior told Donaldson that he needed a housekeeper, Donaldson mentioned that Taylor had a cleaning service and offered to have Taylor contact him. In early June, Taylor went to Senior's house to give a bid on cleaning services. Senior later recontacted Taylor and explained that King intended to do the cleaning and that Taylor's services would not be needed.

Shortly thereafter, Taylor invited Senior to her mother's birthday party. After the party, Senior told Taylor that he wanted her to do the cleaning after all, and she first cleaned for Senior on June 15, 1995. King testified that Senior had a sexual relationship with Taylor and no longer wanted King to visit him because he was afraid that Taylor would find her there and that she would not want King there. Taylor, on the other hand, testified that Senior had had a sexual relationship with King and that he was extremely hurt because he found out that she was living with another man.

From mid-June until late July, Senior spent a great deal of his time at Taylor's house and spent the night there once. Senior paid Taylor $150 for cleaning services in June. In early July, Senior and Taylor took a short vacation together to Brookings. In July, Senior paid Taylor several thousand dollars and also gave gifts of several hundred dollars each to Taylor's sister and mother. Senior also paid off

Taylor's credit card debt of about $3,500. The Age Wise counselor, Gordon, noted that, during the period when Taylor was caring for Senior, the appearance of his house and yard was improved and that there was food available in the house. Gordon also testified that Senior had been depressed and unhappy but that his attitude became better after Taylor started helping him.

Throughout this time, Senior's health was deteriorating rapidly, and Taylor regularly took him to doctor's appointments, obtained prescriptions for him, and managed his bills for him. Senior reported weight loss, weakness, and angina problems to his physician, Dr. Gillette. Tests revealed anemia, renal failure and high calcium, which suggested to Gillette that Senior had multiple myeloma, a type of bone marrow cancer. Prostate and throat cancer also were indicated. Senior was referred to Dr. Traynor, who confirmed the cancer diagnoses. Gillette referred Senior to Southern Oregon Home Heath Care, an agency that gives in-home care. Over the course of treating Senior for several years, Gillette recorded some social history of Senior, indicating that he lavishly spent money on his family, especially a granddaughter in California, but that "he felt that he'd given his other relatives a lot of money and had not gotten anything back from them." Gillette also was aware that Senior had a series of female companions for whom he bought many things.

On July 27, 1995, Senior made arrangements for his broker to sell a municipal bond and place the proceeds into his account, telling him that he planned to use the money for medical treatment. When he visited the broker's office, he introduced Taylor to the broker as his granddaughter. At trial, Taylor testified that Senior had not intended to use the money for medical treatment but had intended to buy a motor home and travel with her.

In August 1995, the Age Wise worker Gordon saw Senior on several occasions. He noted that Senior was in quite a bit of pain but that he seemed mentally competent and alert. Senior also indicated to Gordon that he was very pleased that Taylor was there. Gordon noticed that the house was clean and that Senior was clothed better than he had

been previously. A Home Health Care aide, Keleman, who had given Senior assistance in 1994, also began assisting him again in August 1995. In 1994, she noted little furniture and food in the house, Senior's clothes were very ragged and old, and he seemed estranged from his son and grandsons over financial matters. In August 1995, she noted that Taylor had made the house much more homelike by decorating and providing home-cooked food for Senior. Senior also told Keleman that Taylor had bought him new clothing, and he was complimentary of her. Keleman thought Senior seemed very clear-headed when she saw him in 1995.

Also beginning in August 1995, Home Health Care nurses began visiting Senior in his home. On August 4, 1995, a nurse indicated in a written report:

> "10. Poor family dynamics son came by during admit & son & pt. argued. pt. asking then demanding son leave son left. pt stated 'I haven't talked to him in a long time and I don't want to talk to him now' pt. in tears - sons visit. Lives alone & has x 5 yrs. 11. emotional pt. depressed & unhappy situation son & grandson."

At trial, John II described his confrontation with Senior on August 4, indicating that Senior had told him that he would not receive the house when Senior died. John II was bothered "because the house was already mine, in my opinion; he bought it for me." John II denied that he and Senior were arguing but admitted that Senior was in tears. He stated that Senior would "go into tears when he wanted his way." He further testified that the nurse that was present at the time "sat there and patted his poor little hand like he was a poor little baby that couldn't do anything. I remember that. He was good at manipulating that." On cross-examination, John II indicated that he did not believe Senior's tears were genuine, that he was crying only to get sympathy from the nurse, and that the tears were unconvincing: "My two-year-old grandson does better than that." He stated that Senior wanted him and his family "to kiss his ass more than we did, and he didn't care too much that we didn't."

John III also visited Senior's home on August 4, 1995, and was made aware of Senior's cancer. However, he did not believe that Senior had cancer at that point and, in

fact, stated at trial that he believed at that point that Senior "was too well to have anybody to come in and take care of him." Although he was aware that Senior was part of a hospice program, he did not understand that hospice services were provided to terminally ill people who wished to die at home. During his visit on August 4, John III met Taylor for the first time. During that visit, Senior showed John III some proposed changes to his will but John III refused to read them. John III argued with Taylor about her handling Senior's checkbook for him and told her that there was no reason for her to be in Senior's will. John III told Senior: "Don't do it; she's taking you for the money just like everyone else."

On August 7, Senior visited his attorneys, John Curtis and Mark Deems. Senior recounted to them his confrontation with John II on August 4 that had culminated with Senior ordering John II from the house and told them he wished to modify his will and trust. Taylor brought Senior to their office but was not present during Senior's meeting with the attorneys. Senior informed the attorneys that he no longer wanted either John II or Philomena King to be a beneficiary and that he wanted Taylor to be a beneficiary. Other beneficiaries were to include Nan May and Senior's great-grandchildren. Senior described Taylor as somebody that he liked very much who had been taking care of him. He also expressed concern that his family would challenge the new will and trust. Senior described to the attorneys how he wanted his estate to be distributed but they had no witnesses available at the time, so they rescheduled an appointment for August 10 for the execution of the new documents. Also on August 7, Senior went to his bank and added Taylor's name to his checking account, making it a joint account with right of survivorship. At that point, the account had approximately $14,000 in it.

Senior returned to his attorneys' office on August 10 and read the documents that they had prepared. Again, Taylor brought him to the appointment but did not attend the meeting. Senior made numerous changes to the disposition of the trust at that point: $25,000 each to John II, John III, Ron Ramsey, and Nan May, $20,000 each to great-grandchildren Leslie and Cody Ramsey, and the residue of the

trust estate to Melody Taylor.[2] Senior then executed the new will and trust. Senior also expressed concern that the "no contest" provision of the will would not prevent his family from challenging it and had the attorneys draft the following declaration, to which Senior subscribed and swore:

"I, JOHN C. RAMSEY, SR., being first duly sworn on oath, depose and say as follows:

"I have today executed a restatement of my Trust which was dated December 22, 1994. I am not under the influence of any drug medication and/or treatment which could diminish my abilities to appreciate the nature and consequences of this restatement. I am under no undue influence and/or coercion.

"I have intentionally provided significant, yet smaller amounts for my son and grandsons because they have for several years alienated my affections by being irresponsible, contentious, and constantly seeking financial support from me rather than providing for themselves.

"I have made provisions for MELODY J. TAYLOR in this restatement of trust. MELODY J. TAYLOR provides me care and support. In providing for MELODY J. TAYLOR instead of my sons and grandsons, I am recognizing her for providing for my needs."

Senior also had prepared and executed on that date an advance directive appointing Taylor as his health care representative and providing health care instructions indicating that he wished for no artificial feeding and life support. Both attorneys were of the opinion that Senior was mentally competent at the time he executed all of those documents. Curtis testified that, at the time the documents were executed, Senior knew who his next of kin was and also knew the extent of his property.

Also on August 10, Senior paid off another credit card bill for Taylor and paid off her home mortgage of approximately $38,000. He used the money that he had planned to use for the motor home. At trial, Taylor testified that Senior

---

[2] Based on our review of the record, we would estimate that the residue would be about 60 percent of Senior's total estate.

gave up his plans for traveling in the motor home when he realized that he was too ill to travel. When Senior's stockbroker saw the check for the home mortgage clear, he called Senior to ask about it. Taylor explained to him that the check had paid off her mortgage, that it was a birthday present, and that she was not Senior's granddaughter but his "significant other." The broker also talked to Senior, who confirmed that the mortgage payoff was a birthday gift.

On August 10, 1995, John III visited Senior and was told that Senior had kidney failure. He testified that he still did not understand that Senior was dying. Taylor was not present during their meeting. Senior again asked John III to read the changes Senior made in his will and trust, but John III refused to do so. Later that day, John III argued with Taylor and stated his belief that she did not care for Senior and was there only for his money. John III tried to order Taylor out of the house, but she refused to leave. That argument took place in front of a hospice worker, whose notes for that day indicate: "Family support absent due to dysfunctional relationships w/ son & grandson who live locally." Further notes from that day indicate that the hospice worker believed Taylor to be too inexperienced and immature to be Senior's primary caregiver and that attempts to explain the gravity of Senior's illness were unproductive. A Home Health Care nurse that visited Senior on August 10 indicated that he was mentally alert and competent but in a lot of pain. Some time after the meeting on August 10, John III told Taylor that Senior was only "faking" illness in order to get her attention and that he would get better if she left.

Beginning on August 13, Taylor stayed at Senior's home to take care of him. On August 15, 1995, Gillette made a house call on Senior because he was leaving town shortly and did not expect Senior to live much longer. Gillette found Senior to be in pain and unable to sit up but also found that Senior talked in his usual manner. Gillette believed that Senior understood that the disease was progressing rapidly and that he did not have long to live. Senior indicated to Gillette that he did not want any aggressive medical therapy to prolong his life but wanted only palliative measures. Gillette believed that Senior was competent to make that decision at that point. Gillette prescribed Duragesic skin

patches and Propacet for pain control. Gillette was of the opinion that Taylor was a concerned and compassionate caregiver.

Also on August 15, 1995, Senior saw Dr. Sandefur at the radiation oncology department at the Rogue Valley Medical Center for an evaluation for treatment of his cancer.Sandefur perceived that Senior was in excruciating pain. Sandefur determined that Senior's pain was caused by the multiple myeloma and that he was in profound renal failure. Sandefur described the pain from multiple myeloma as "some of the worst pain that we see." Sandefur told Senior that he had days to weeks to live. Senior told Sandefur that he did not want any form of treatment but that he wanted to be comfortable. Sandefur believed Senior to be mentally competent to make that decision. Sandefur gave Senior a shot of Demerol to control the pain before he left the medical center.

On August 16, 1995, John III came to Senior's house with a Jackson County sheriff's deputy, with the intention of having the deputy remove Taylor from Senior's home. He told the deputy that Taylor was "taking [Senior] for all he was worth." John II also was present but remained outside because it was understood that his presence would upset Senior. The plan was for the deputy to confront Taylor while John III went to get his grandfather. John III went through the house while the deputy confronted Taylor, and John III tried to pull Senior up from where he was lying down, which caused Senior a great deal of pain. John III therefore put him back down. Meanwhile, Taylor showed the deputy the advance directive for health care, and he determined that Senior had authorized Taylor to take care of him. Taylor and the deputy came into the room, and Taylor cursed and yelled at John III for jerking Senior out of bed and causing him pain. The deputy asked John III to leave, then asked Senior if he wished Taylor to remain there, and Senior indicated that he did. The deputy then explained to John III that he would need to get a lawyer to see about having Taylor removed.

On August 17, Senior's attorneys visited him at his home, in order to bring him paperwork necessary to fund the trust. At that time, Senior executed yet another declaration of intent, stating that he was aware that he was dying, that

he was under no undue influence, and that he believed that his son and grandsons, for the previous several years, had "been more concerned with my wealth than my well being. I have intentionally made gifts and provisions for MELODY J. TAYLOR and others instead of my son and grandsons. I feel it is my money to do with as I please." At that time, Senior also signed a request expressing his wish "to be cremated and placed with the cremation of my deceased wife, Millie, and distributed to the Brookings, Harbor area which I showed to MELODY J. TAYLOR, and hereby request that MELODY J. TAYLOR be the distributee thereto."

While Senior's attorneys were visiting on August 17, John II's half-sister Kasser came to Senior's house with several of her friends. She testified that Taylor and her mother and grandmother were present, as was a hospice worker. She testified that Senior was "fine and healthy" and "very alert" during her visit. She further testified that Taylor and her grandmother smelled of alcohol and that Taylor interrupted her when she spoke with Senior. She was suspicious of Taylor. Taylor became angry with one of Kasser's friends and asked her to leave because the woman refused to tell Taylor her name. Kasser further testified that Senior had told her in the past that he had bought the house in which he was living for John II.

Around the same time, Senior had Taylor contact Jill Brogdon. Taylor told Brogdon that Senior was dying of cancer and wanted to see her. Taylor's mother picked up Brogdon at the airport and took her to see Senior four days before his death. Senior was glad to see her and was "very alert" but was in pain. She saw Senior again the day before his death and saw that he was noticeably more fatigued than he had been several days earlier. Senior's niece, Nan May, also was flown in to visit, as one of Senior's last wishes.[3]

On August 18, 1995, Gillette prescribed morphine elixir, one teaspoon to be taken every four hours as needed, for pain control. Gillette told Taylor that "she should use what was needed to help keep him out of pain." Taylor

---

[3] May is a defendant in this action but did not testify at trial and, although named as a cross-respondent on John II's cross-appeal, has not appeared on appeal.

administered the medication according to the doctor's instructions.

On August 19, one of the visiting nurses contacted Dr. Hites, who was on call for Gillette, because Senior was still in pain. Hites increased the morphine dosage to one teaspoon every two hours, as needed. Taylor administered the medication according to the doctor's instructions. Also on that date, Taylor contacted Ron Ramsey's family and indicated that she did not believe that Senior would live much longer. She asked if they would come over that evening. Wendy Ramsey agreed that they would come over the following day.

On August 20, 1995, the visiting nurse assessed Senior's pain as 10 on a scale of 1 to 10 and again contacted Hites, who increased the morphine dosage to one teaspoon every hour, as needed. Again, Taylor administered the medication as prescribed. Wendy and Ron Ramsey visited that day, with their daughter Leslie. A Home Health Care nurse was present during part of their visit. Wendy described Senior as curled in fetal position and shaking. He woke up several times but would fall back asleep. She noted that he had blue liquid on the corner of his mouth. She also testified that Taylor and her mother were drinking beer and that Taylor offered her a beer, as well. Leslie Ramsey fed Senior a strawberry but he was unable to keep it down. Ron Ramsey first met Taylor on this occasion but did not speak to her very much. When he saw his grandfather's condition, he cried and held his hand. He had known of his grandfather's cancer but had not believed that the condition was serious.

Ron then called John II, who came over. John II argued with Taylor, stating that she was trying to take Senior's money and that he was going to get her kicked out of the house. John II believed that some of Senior's belongings had been removed from the house.

On the morning of August 21, Senior died. The same visiting nurse that had attended him the previous two days was present at the time. After his death, Senior's remains were taken to a funeral home. Shortly thereafter, Taylor notified the funeral home of Senior's cremation request and of his desire that she spread his and his wife's ashes. An employee

at the funeral home told Taylor that she had no right to do that and that Senior's family would need to instruct the funeral home as to the disposition of his remains. The employee further testified that Taylor stated that Senior had not wanted an autopsy to be performed. She further testified that Senior's family wanted an autopsy. Senior's attorney, Curtis, also contacted the funeral home to try to make arrangements for disposition of Senior's remains according to his wishes but also was told that the funeral home would deal only with Senior's family.

An autopsy was performed on Senior at his family's request by medical examiner Dr. James Olson. Olson determined that Senior had been suffering from renal failure and that he had a high level of morphine and morphine metabolites in his system at the time of his death. Olson testified that this amount of morphine and morphine metabolites was in the lethal range. He testified that, although that amount of morphine might be tolerable by someone who had been on the medication for several weeks due to the body's adaptive response to the drug, it was enough to bring about Senior's death from morphine overdose. He further testified that the death had not been classified as homicide, suicide or accident but had been left undetermined. Olson acknowledged that Senior had been suffering from multiple myeloma and that he would have been in a lot of pain from that condition. He testified that he was disturbed that the morphine had been administered by a caregiver who had no medical credentials. He acknowledged that he understood that the morphine dosage had been increased to one teaspoonful per hour on orders of a doctor, but stated that he was "guessing, over the phone and that's—[the doctor's] basing his decision on the report of the caregiver."

At trial, John II also introduced testimony from an expert witness, Dr. Luther, a psychiatrist. Luther had never met Senior but reviewed medical records, police reports, and Taylor's deposition. Based on that material, Luther concluded that Senior was susceptible to influence by others. He noted that Senior had a well-documented history of using money to manipulate people, had exhibited bad judgment for

years, and that his problem was not physiological but psychological. Luther believed that Senior had a propensity to buy approval from people with his money, due to a lack of self-confidence, which made him vulnerable because he would do things to get approval from others.

At trial, defendants produced expert testimony by Thomas Murray, who holds a doctoral degree in pharmacology and has taught pharmacology at various universities. Murray had published several articles concerning morphine pharmacology. He reviewed the records of Senior's intake of morphine between August 18, when it was first prescribed, and his death on August 21. He explained that, due to morphine's half-life, it can build up in the body faster than it is being broken down and its metabolites excreted. This build-up can be exacerbated by renal failure due to the kidneys' inability to excrete morphine metabolites. In particular, the kidneys' inability to excrete the morphine metabolite 6-glucuronide can cause a serious problem because, although both the morphine and the metabolite are analgesics, "this metabolite is six times more potent than morphine." Murray opined that, even before Senior's morphine dosage was increased to one teaspoon per hour, the morphine concentration in his body had entered the lethal range due to his limited ability to metabolize 6-glucuronide as a result of his renal failure. Murray further opined that Senior did not die of a morphine overdose, that is, an excessive amount of morphine administered all at once, because the amount of morphine, as compared to the metabolite, did not indicate that. Rather, he believed that Senior had died due to the large concentration of unexcreted morphine metabolites present in his system. He further opined that the amount of morphine and morphine metabolites present at the time of death were consistent with the dosage prescribed by Senior's physicians. He noted that, although the relationship between renal failure and the inability to excrete morphine metabolites was "textbook knowledge" for physicians, morphine nonetheless was the drug of choice in treating terminal cancer patients because it provided superior pain control. He further opined that if the patient was not terminal, then morphine would not be used in this manner.

Another fact that came out at trial is relevant to our analysis, although it does not fit within the chronology as set forth above: The vast majority of the fact witnesses who testified at trial, for both sides, expressed the opinion that Senior loved power, liked to use money to manipulate people, and regularly changed his will or threatened to change his will in order to manipulate people. John II testified that Senior "loved his power; money was power." As noted above, John II expressed a belief that Senior wanted the family "to kiss his ass more than we did" but that John II was "not going to bow down and lick [Senior's] feet."

In a lengthy written opinion, the trial court concluded that Taylor was not precluded from benefitting from Senior's will on the ground that she took his life with felonious intent, given that the prescribed amounts of morphine, combined with Senior's renal failure, accounted for the amount of morphine in Senior's body at the time of his death. The court did, however, conclude that Taylor was precluded from benefitting under Senior's will on the ground that she exercised undue influence over Senior in the disposition of his estate. Following the formula for assessing undue influence set forth in *In re Reddaway's Estate*, 214 Or 410, 329 P2d 886 (1958), the court concluded that Taylor had a confidential relationship with Senior, that there were suspicious circumstances surrounding Senior's execution of his final will and trust, and that consideration of the various factors set forth in the *Reddaway* case led to a conclusion that Senior was unduly influenced by Taylor in the disposition of his estate. Those factors are discussed in detail below. The court further concluded that Taylor unduly influenced Senior to pay off the mortgage on her house and to add her to his checking account with rights of survivorship and therefore also set aside those lifetime transfers to Taylor. The court also concluded that the cash payments and payments on Taylor's credit cards, amounting to some $19,000, bore a reasonable relationship to the economic value of the services Taylor provided to Senior in the final months of his life and declined to set aside those transfers. The trial court finally concluded that, although Taylor exercised undue influence in the execution of Senior's final will and trust, it should only be set aside insofar as it benefitted Taylor. The court therefore

allowed the provisions to the other beneficiaries to remain intact.

■ We turn first to the primary issue raised by Taylor and First Interstate on appeal, as resolution of that issue is dispositive of most of the other issues presented. The issue is whether Taylor exercised undue influence over Senior in the payment of her mortgage, the assignment of a right of survivorship in his checking account, and the disposition of his estate under his final will and trust. Although we agree with the trial court that *In re Reddaway's Estate* provides the necessary framework for analysis of the undue influence claim, we reach a different conclusion than the trial court, primarily based on our assessment of the facts on *de novo* review, which differs somewhat from the trial court's assessment of the facts.

■ In *Reddaway*, the Supreme Court noted that there are two distinct approaches to analyzing undue influence. In one approach, the basic question is whether the testator was induced to execute an instrument that, in reality, did not express the testator's wishes but the wishes of another. 214 Or at 418. The other approach, and the one the court ultimately adopted, focuses not on the testator's freedom of will but on "the nature of the influencer's conduct in persuading the testator to act as he does." *Id.* at 419. Under that approach, undue influence "denotes something wrong, according to the standards of morals which the law enforces in the relations of men, and therefore something legally wrong, something, in fact, illegal." *Id., quoting Morris v. Morris,* 192 Miss 518, 6 So 2d 311 (1942) (internal quotations marks omitted). Under this "moral standard" approach, "the consequences of upholding the influenced gift are important. It would be expected that there would be less concern with the influencer's motive in a contest between him and the state claiming by escheat than there would be in a contest between him and the donor's deserving spouse." *Reddaway,* 214 Or at 419.

■ The court went on to devise a test by which this "moral standard" could be applied in undue influence cases.

First, a court must determine whether a "confidential relation" existed between the testator and the challenged beneficiary. Such a relationship is one " 'such as to indicate a position of dominance by the one in whom confidence is reposed over the other.' " *Id.* at 421, *quoting Doneen v. Craven, Executor, et al.*, 204 Or 512, 522, 284 P2d 758 (1955). The court specifically noted that such a relationship may exist where the testator is guided by the judgment and advice of another, and it may exist between a patient and a nurse. *Id.* If a confidential relationship exists and "suspicious circumstances" are shown, then " 'the beneficiary [must] go forward with the proof and present evidence sufficient to overcome the adverse inference.' " *Id.* at 420, *quoting In re Southman's Estate*, 178 Or 462, 482, 168 P2d 572 (1946). The *Reddaway* court then enumerated seven criteria by which to evaluate whether "suspicious circumstances" are present: (a) whether the challenged beneficiary participated in the preparation of the will; (b) whether the testator received independent advice from an attorney in preparing the will; (c) whether the will was prepared in secrecy and haste; (d) whether the decedent's attitude toward others had changed by reason of his or her relationship with the challenged beneficiary; (e) whether there is "a decided discrepancy between a new and previous wills of the testator; and continuity of purpose running through former wills indicating a settled intent in the disposition of his estate"; (f) whether the disposition of the estate is such that a reasonable person would regard it as unnatural, unjust or unfair; and (g) whether the testator was susceptible to undue influence. *Id.* at 421-27. We turn to the application of these factors to the present case.

## I. CONFIDENTIAL RELATIONSHIP

■ We agree with the trial court that a confidential relationship existed between Senior and Taylor. Evidence in the record establishes not only that Taylor and Senior spent most of their time together in the last few months of his life but also establishes that Taylor took increasing responsibility over that time in managing all aspects of Senior's day-to-day life, including procuring and administering his medications, arranging and driving him to medical and business appointments, caring for his house and clothes, providing his food,

and managing his checkbook. Taylor and First Interstate argue that no confidential relationship has been established because there is no direct proof that Taylor offered, or Senior accepted, business or financial advice from her. They further point out that an abundance of evidence demonstrates that Senior had strong opinions and ideas about what to do with his money. As to the question of direct evidence that Taylor gave business or financial advice, we disagree that direct evidence is necessary to establish a confidential relationship under these circumstances. Unrebutted evidence establishes that Senior reposed confidence in Taylor to handle most aspects of his daily life, including his finances. *See Albright v. Medoff*, 54 Or App 143, 145, 634 P2d 479 (1981) (evidence that testator added beneficiary as authorized signatory to checking account was evidence of confidential relationship). The evidence also amply demonstrates that Senior made numerous financial decisions in the final months of his life that provided monetary benefits to Taylor. Moreover, evidence that Senior was strong-minded does not directly bear on the question of whether he had a confidential relationship with Taylor; that evidence is more properly considered in conjunction with the "susceptibility to influence" factor discussed below. Given the circumstances, we conclude that a confidential relationship existed between Senior and Taylor.

The question, then, is whether "suspicious circumstances" are present that would require Taylor to go forward with " 'evidence sufficient to overcome the adverse inference' " of undue influence. *Reddaway,* 214 Or at 420, *quoting Southman's Estate,* 178 Or at 482. We turn to each of the factors listed by the *Reddaway* court to evaluate "suspicious circumstances."

## A. *Procurement*

■ This factor concerns whether the beneficiary participated in the preparation of the challenged will. There is evidence that, before Senior's meeting with his attorneys on August 7, Taylor assisted Senior in preparing a revision of the previous trust document, substituting herself for Philomena King as a beneficiary. It is undisputed that the documents that Senior actually signed on August 10 did not reflect the same changes in the disposition of his estate as did

the changes that Taylor assisted in preparing. However, it also is undisputed that the documents actually executed on August 10 did, in fact, give a greater amount of Senior's estate to Taylor than did the revision that Taylor helped to prepare. In sum, we find that there is sufficient evidence of "procurement" to suffice as a "suspicious circumstance." More attention is given to this factor in the section below, concerning whether evidence was presented to overcome the "adverse inference" drawn from the presence of a confidential relationship and suspicious circumstances.

B. *Independent Advice*

■ This factor concerns whether Senior "had the benefit of the independent advice of his own attorney in drawing up the new will" that benefitted Taylor. *Reddaway*, 214 Or at 422. Also relevant to this factor is whether the beneficiary was present during the meeting with the attorneys. *Id.* at 423. That a beneficiary made the appointment and escorted a testator to an attorney's office do not, in themselves, support an inference of undue influence. *See Knutsen v. Krippendorf*, 124 Or App 299, 309-10, 862 P2d 509 (1993), *rev den* 318 Or 381 (1994). Evidence in the record establishes that Senior met with his attorneys on two occasions to prepare his final will and trust and that Taylor was not present at those meetings. Although we have found it to be a suspicious circumstance where a testator is taken to a beneficiary's attorney rather than his or her own attorney to prepare a will, *see Sangster v. Dillard*, 144 Or App 210, 218, 925 P2d 929 (1996), *mod on other grounds* 146 Or App 105, 931 P2d 815 (1997), it is undisputed that Senior consulted his own attorneys, who had previously prepared a will and trust for him. Moreover, one of the attorneys testified that Senior told him that Taylor had been of no help to him in deciding how to dispose of his estate. Also, the attorneys discussed with Senior his intent to benefit Taylor and the reasons why he was benefitting Taylor to a greater extent than he was benefitting his family. We conclude that no "suspicious circumstance" was present regarding whether Senior received independent advice concerning his last will and trust.

C. *Secrecy and Haste*

■ This factor concerns whether there was "secrecy and haste attendant on the making of the will." *Reddaway*, 214

Or at 423. We do not find that there was any secrecy attendant on the making of Senior's final will and trust. As stated in the facts recited above, Senior attempted to talk to both John II and John III about the changes he planned to make to his will and trust on August 4, several days before consulting his attorneys. That precipitated the disagreement described above. Senior again attempted to discuss the changes with John III on August 10. There is no evidence from which it can be inferred that Senior's final will and trust were prepared in secrecy. Given Senior's history of threatening and following through on his threats to cut family members from his will, it is entirely consistent with Senior's past behavior that he would inform his family of his intent to reduce their prospective inheritances. As to haste, the evidence shows that Senior's final will and trust were prepared in relative haste, undoubtedly due to his deteriorating physical condition. We do not believe, however, that haste in preparing and executing a will because the testator understands that he is terminally ill is the type of haste that the court had in mind when it declared that "haste and secrecy" could be a "suspicious circumstance." We do not consider the relative haste with which Senior prepared and executed his final will and trust to be a "suspicious circumstance" in light of the fact that no secrecy was involved.

### D. *Change in Decedent's Attitude Toward Others*

■ This factor concerns whether there has been an unexplained change in the testator's "attitude toward those for whom he had previously expressed affection[.]" *Reddaway,* 214 Or at 423. The trial court found that, although Senior had had negative feelings toward his family before Taylor even met Senior, Senior "had been kept away from his family and friends by Ms. Taylor during the last two months of his life which had an effect on his attitude toward his family." On *de novo* review, we disagree with the trial court's factual conclusion. There was evidence that Senior spent a great deal of time with Taylor in June and July 1995 and therefore often was not at home. He also spent a great deal of time with Taylor in August during his final illness, when she stayed at his home with him. There also was evidence that Senior did not *wish* to see John II, as shown by his statement on August 4 to his nurse that "I haven't talked to

him in a long time and I don't want to talk to him now." Further evidence is John II's behavior in choosing to remain outside of Senior's house on August 16 while John III attempted to have the sheriff's deputy remove Taylor from the house, because the Ramseys understood that John II's presence would upset Senior.

There was evidence that Taylor was protective of Senior, that she was upset by John II's behavior in causing Senior to cry on August 4, and also when John III pulled Senior from his bed on August 16th, causing him pain. There is also evidence that Taylor was irate with guests such as Kasser and her friends when they were rude to her and that she engaged in verbal battles with John II and John III when they threatened her. However, there also was evidence that John II, John III, and Ron Ramsey all had occasion to be alone with Senior during the last month of his life without Taylor's interference (although there is no evidence that Ron Ramsey made any effort to visit Senior until the day before his death). There also was evidence that Taylor facilitated visits by Senior's friend Jill Brogdon and his niece Nan May during the final week of his life, at his request. The evidence does not support the trial court's conclusion that Taylor kept Senior from his family and friends during the final months of his life.

As to whether Senior's attitude toward others changed during the final months of his life when he was involved in a relationship with Taylor, there is some evidence that his relationship with his family, and in particular, his relationship with John II, deteriorated during this time. The question, however, is whether there was an "unexplained" change in attitude toward one for whom the testator "had previously expressed affection." *Reddaway*, 214 Or at 423. As the trial court acknowledged, Senior's disaffection for John II had begun well before Senior even met Taylor. In fact, from the time that John II moved out of Senior's house in 1991 due to their disagreements, until Senior executed his 1994 will and trust, Senior had entirely disinherited John II. Even from that time in 1994 to mid-1995, when Senior's and John II's relationship arguably had improved, Senior expressed his dissatisfaction with John II to his attorney and also told

the Age Wise worker Gordon that John II invited him to coffee only to get Senior to pay for it. Given the history of the stormy relationship between Senior and John II and the details of the argument between them on August 4 that culminated with Senior ordering John II from his house, it would be difficult to say that there was an "unexplained" change in Senior's attitude toward John II that can be attributed to Taylor's influence. *Compare Sangster*, 144 Or App at 217-18 (testator who underwent an "extreme change in attitude" toward the grandchildren to whom she intended to leave her estate up until the last month of her life was under "undue influence"); *cf. Knutsen*, 124 Or App at 309 (testator's "drastic change" in attitude toward new beneficiary and previous beneficiary shortly before will was executed was indicative of new beneficiary's dominance over testator).

E. *Change in the Testator's Plan of Disposing of His Property*

██ This factor concerns whether there is "a decided discrepancy between a new and previous wills of the testator; and continuity of purpose running through former wills indicating a settled intent in the disposition of his estate[.]" *Reddaway*, 214 Or at 424, *citing In re Estate of Elise Rosenberg*, 196 Or 219, 230, 246 P2d 858 (1952). Frankly, the only continuity of purpose that can be gleaned from Senior's prior wills and trusts is his purpose of disinheriting beneficiaries with whom he had recently fought and disinheriting or reducing the inheritance of those to whom he had already given substantial gifts. To summarize: In the mid to late 1980s, Senior had Brogdon write out revisions to his will on several occasions after threatening to cut off family members who either asked for or received funds from him. In 1990, after buying a house in which he allowed John III's family to live, Senior executed a will leaving John III 10 percent less than he was leaving to John II and Ron Ramsey. After giving the house to John III in 1991, Senior disinherited him entirely in his next will. After John II moved out of Senior's new house in 1991 due to their disagreements, Senior disinherited him, as well. Evidence showed that Senior provided living accommodations to his granddaughter Davis around that time and that the next trust, the one prepared but never

executed in 1993, disinherited Davis, but reinstated John II, John III and Ron Ramsey as minor beneficiaries. There was evidence that Senior gave money to his granddaughter Zabel and that she later was omitted from the 1994 will and trust. It is also notable that the will and trust benefitting Taylor was not the first to provide generous benefit to one of Senior's "significant others."

In short, over the last decade of his life, Senior's various wills and trusts did not reveal any settled intent as to the disposition of his estate. Although all of them, including the last, benefitted family members to some extent, which family members were benefitted varied greatly, apparently based on Senior's most recent dealings with them.

## F. *Unnatural or Unjust Gift*

■ This factor was described by the *Reddaway* court as follows: If a testator "make[s] an unfair or unnatural disposition, it is a circumstance to be weighed in determining whether improper influence had been used." 214 Or at 424. This factor is, perhaps, one of the most elusive. The *Reddaway* court indicated that a testator may "favor his mistress over his wife, or he may disinherit a deserving son," *id.*, but that such a disposition would be considered "unnatural" and would constitute a circumstance to be weighed in determining if undue influence had been used. Under the facts of *Reddaway*, the court clearly considered a disposition favoring a caregiver who apparently provided sexual favors to the testator and who had only known him a short time to be "unnatural," given that it was made "at the expense of a faithful son who has devoted a good share of his life to his father's business[.]" The court emphasized that influence gained "by kindness and affection" is not necessarily "undue influence" but that "the law does not disregard the donee's purpose or motive in eliciting the donor's affection." *Id.* at 425-26. The court stated that, "[i]f it is established that the donee generated the donor's affection for him solely for the purpose of inducing a gift, the court will ordinarily find a way to deprive the donee of the fruits of his deception." *Id.* at 426.

Here, the testator has chosen to favor a "significant other," or "mistress" as the *Reddaway* court would put it, to a greater extent than he has favored his family members.

Moreover, the testator had known this "significant other" for only a little more than two months at the time of his death. Also, although there is no direct evidence that Taylor generated Senior's affection "solely for the purpose of inducing" him to make gifts, we can infer from the circumstances that Senior's generosity toward her may have had something to do with her willingness to show him affection. We take into account the fact that Senior was in his 80s at the time he met Taylor and clearly was not easy to get along with and the fact that Taylor was in her 30s. We also take into account that, within weeks of meeting Senior, Taylor took a vacation with him and began accepting very generous gifts of cash from him. We conclude that this evidence is sufficient to describe Senior's choice to benefit Taylor as a "suspicious circumstance" under the test of *Reddaway*. However, we will address this topic again in the section below concerning whether sufficient evidence was presented to overcome the "adverse inference" drawn from the presence of a confidential relationship and suspicious circumstances.

## G. *Donor's Susceptibility to Influence*

 Finally, the court must consider the "physical and mental condition of the donor" in determining whether a disposition of property was the result of undue influence. *Id.* at 426. The court in *Reddaway* concluded that, under the facts of that case, the testator's "mental and physical condition made him an easy mark for one who might wish to influence him." *Id.* at 427. The court did not, however, "think that it is necessary to recite this evidence." *Id.* Looking back to the statement of facts in that case, though, we can discern the evidence to which the court referred. The testator in *Reddaway* came under the care of the caretaker/mistress at a time when he was "almost helpless, due to a series of paralytic strokes." *Id.* at 414. Although there was evidence by a physician that the testator's mind was clear, *id.* at 415, there also was evidence that a written request was made to his attorney, ostensibly by the testator, at a time when he was unable to write without someone guiding his hand. *Id.* at 416. The court concluded that the evidence was "quite clear" that the testator "was emotionally unstable, probably senile, during the period that influence was alleged to have been exerted." *Id.* at 416-17. Similarly, in *Knutsen*, 124 Or App at 312, the

court found that a testator who was "physically ill, on medication, confused, disoriented and suffering from memory loss" was susceptible to influence.

By comparison, the evidence in this case shows that Senior remained fairly physically active until the last few days of his life, when the pain of his cancer rendered him relatively immobile. Although he clearly was deteriorating quickly due to the rapid spread of his cancer, he was not physically helpless or feeble until after he executed his final will and testament. Concerning Senior's mental susceptibility to undue influence, we find no evidence of senility or instability or that his mental condition made him an "easy mark." *Reddaway*, 214 Or at 427. Also, there is no evidence that he was confused, disoriented, or suffering from memory loss. *Knutsen*, 124 Or App at 312.

The testimony of a great number of the fact witnesses, and even the expert testimony of Luther who opined that Senior *was* susceptible to influence, convinces us that Senior was not, in fact, susceptible to undue influence. The evidence demonstrates that Senior had, for approximately the last decade of his life, consciously chosen to get attention, indeed homage, from others either by giving them generous gifts or promising them generous parts of his estate. He appears to have been fully aware that he was using his money to obtain attention from his family and friends. We do not agree with Luther's assessment that Senior's use of his money in this manner demonstrates vulnerability to undue influence. Rather, it demonstrates that Senior was intent on influencing others, not that he was influenced by others.

## II. DID TAYLOR OVERCOME THE ADVERSE INFERENCE?

Under the rubric provided by *Reddaway*, we have concluded that Taylor had a confidential relationship with Senior and that two suspicious circumstances were attendant on the making of his final will and trust. The question, then, is whether there is evidence in the record to overcome the adverse inference that must be drawn from our findings thus far. We believe that there is.

The first suspicious circumstance that we found was that Taylor assisted Senior in drafting revisions to his 1994 trust before he consulted his attorneys in August 1995. In light of other evidence in the record, however, we find that any adverse inference to be drawn by this circumstances has been overcome. The record shows that Senior had, for about the last decade of his life, relied on his female companions to write down potential changes to his wills and trusts. Taylor certainly was not the first companion to do so. Moreover, although Senior had assistance from his companions in drafting potential revisions, it is clear from the testimony of his attorneys that, at least for the 1994 and 1995 revisions, he sought and received independent advice from his attorneys, then made additional changes in the disposition of his estate before executing the documents. Furthermore, one of Senior's attorneys testified that, before Senior executed his final will and trust, Senior stated that Taylor had been of no help to him in deciding how to dispose of his estate. We conclude that Taylor has overcome any adverse inference to be drawn from her participation in preparing a preliminary draft of Senior's final will and trust.

The other suspicious circumstance that we have found to be present in this case is that Senior's choice to benefit a "significant other" whom he had known for only a few months rather than leave his entire estate to family members and that this may be termed an "unnatural" disposition under the *Reddaway* test. There are two facets to our analysis of whether a gift is, in fact, an "unnatural" one. The focus in our discussion above, in which we concluded that the disposition here qualified as "unnatural," was on Taylor's reasons for fostering a friendship and accepting large gifts from a much older man. Our focus in considering whether she has overcome the adverse inference to be drawn from those circumstances is on the other facet of the equation—did the testator, by making such a disposition, actually "disinherit a deserving" family member, *Reddaway*, 214 Or at 424, or make the "gift at the expense of a faithful" family member? *Id.* at 425.

First, we note that this case is unlike many of the cases that find a gift to be "unnatural" when it deprives a family member of an amount that the child would have

expected to take under previous dispositions. In this case, the record reflects that, under most of his previous wills and trusts, Senior wished John II either to receive nothing or to receive a relatively small portion of the estate. Even the previous will and trust most beneficial to John II allocated to him only 36 percent of the estate. There is no indication in the record that Senior ever intended John II to be the primary beneficiary of any will and trust.

Second, the record amply demonstrates that Senior did not perceive John II as either "deserving" or "faithful" for a long period of time before Taylor came on the scene. Clearly, Senior felt he was entitled to more attention and respect from his family, as shown by his numerous comments to others. John II, on the other hand, testified that Senior wanted him to "kiss his ass" and that he was unwilling to "lick his feet." The final disagreement between John II and Senior, which occurred only days before he executed his final will and trust, involved John II claiming an entitlement to Senior's home. Although we certainly do not pass judgment on the behavior of either John II or Senior toward each other, the record supplies ample evidence—and evidence that has nothing to do with any influence that Taylor had over Senior—that Senior had reason to conclude that John II was neither "deserving" nor "faithful" as those terms are used in *Reddaway*.

Finally, and perhaps most important to our analysis, we take seriously Senior's sworn declarations of August 10 and 17, in which he made it clear why he was choosing to benefit Taylor to a greater extent than John II: Senior declared that John II had been "irresponsible, contentious, and constantly seeking financial support" from Senior, whereas Taylor had been providing him with "care and support." Senior also declared that John II had, in recent years, "been more concerned with my wealth than my well being."

On this record, we feel compelled to honor Senior's wishes as to the disposition of his estate. Although Taylor was on the scene only for a short time, she provided Senior the care and comfort that he wanted and needed during the final stages of a very painful illness. The Ramsey relatives, on the other hand, and we refer specifically to John II and

John III, provided Senior no support at the end of his life, expressed opinions that he needed no support or care and was only acting ill or upset to get attention from Taylor and his nurses, fought with him about his money and estate and, in general, acted exactly as Senior said: "more concerned with [Senior's] wealth than [his] well being." Senior's declarations on August 10 and 17, as supported by other evidence in the record, overcome any adverse presumption that his bequest to Taylor is "unnatural" or "unjust" under the circumstances.

We therefore conclude that the trial court erred in setting aside the portions of Senior's final will and trust that benefitted Taylor. For essentially the same reasons set forth above, we also conclude that the trial court erred in setting aside Senior's *inter vivos* gifts to Taylor.

## III. CROSS-ASSIGNMENTS OF ERROR

Our disposition of the appeal renders moot John II's cross-assignment of error that the trial court erred in invalidating only the portions of the will and trust that benefitted Taylor. Given our conclusion that the trial court erred in invalidating any portion of the will and trust, there is no need to address this cross-assignment of error.

In his final assignment of error, John II argues that the trial court erred in failing to set aside all of the *inter vivos* transfers to Taylor. Although John II did not assign error to the trial court's conclusion that Taylor did not feloniously kill Senior by administering the prescribed morphine, John II argues that, as a matter of "equity and good conscience," Taylor should not be entitled to keep any money that she received from Senior because she "was the person who administered or directed the administration of the morphine." We reject John II's argument. We agree with the trial court's conclusion that Taylor administered the morphine in the amounts prescribed by Senior's physicians. We also agree with its conclusion that that amount of morphine was required to control the excruciating pain that Senior was experiencing during the last days of his life. The record shows that, although it was common medical knowledge that administering such an amount of morphine to a terminal

cancer patient suffering from renal failure could lead to the result seen here, physicians are known to use morphine in these circumstances anyway, in order to ease the suffering of dying patients.

We have concluded that Taylor did not exercise undue influence over Senior when she received *inter vivos* gifts from him or when he made her a major beneficiary of his final will and trust. We do not find that "equity and good conscience" require us to deprive Taylor of those gifts on the ground that she and Senior's physicians carried out his wishes that he receive only palliative care during his final illness.

Reversed and remanded on appeal with instructions to administer John C. Ramsey Sr.'s estate in accordance with his final will and trust; affirmed on cross-appeal.